**[J-68A-B-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 29 EAP 2015 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court dated December |
| | : | 17, 2014 at No. 1990 CD 2012, |
| v. | : | reversing the Order of the Court of |
| | : | Common Pleas of Philadelphia County, |
| | : | Criminal Division, dated May 1, 2012 at |
| 1997 CHEVROLET AND CONTENTS | : | No. CP-51-MD-0013471-2010 |
| SEIZED FROM JAMES YOUNG | : | |
| [ELIZABETH YOUNG], | : | |
| | : | ARGUED: May 11, 2016 |
| | : | |
| Appellee | : | |
| | | |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 30 EAP 2015 |
| | : | |
| Appellant | : | Appeal from the Order of |
| | : | Commonwealth Court dated December |
| | : | 17, 2014 at No. 1995 CD 2012, |
| v. | : | reversing the Order of the Court of |
| | : | Common Pleas of Philadelphia County, |
| | : | Criminal Division, dated May 1, 2012 at |
| THE REAL PROPERTY AND | : | No. CP-51-MD-002972-2010 |
| IMPROVEMENTS KNOWN AS 416 S. | : | |
| 62ND STREET, PHILADELPHIA, PA | : | ARGUED: May 11, 2016 |
| 19143 [ELIZABETH YOUNG], | : | |
| | : | |
| Appellee | : | |

**OPINION**

**JUSTICE TODD**                                                     **DECIDED: May 25, 2017**

The Eighth Amendment to the United States Constitution guarantees citizens protection against the government by limiting its power to punish.  In this appeal by

allowance, we consider, *inter alia*, the constitutional limitations on civil *in rem* forfeiture in Pennsylvania under the Excessive Fines Clause of the Eighth Amendment,[1] where the government attempts to seize through forfeiture a home and vehicle not based on any criminal conduct by the property owner — here, a 71-year-old grandmother — but upon the illegal conduct of a third party — her adult son. In doing so, we attempt to reconcile the uncertain constitutional jurisprudence underlying civil *in rem* forfeiture and provide clarity and uniformity regarding the appropriate constitutional standard to be applied to excessive fines challenges to civil *in rem* forfeitures in our Commonwealth.

As more fully explained below, we find the proper constitutional construct in determining whether an *in rem* forfeiture violates the Excessive Fines Clause of the Eighth Amendment requires an initial determination regarding the relationship between the forfeited property and the underlying offense — the instrumentality prong. If this threshold prong is satisfied, the next step of the analysis is a proportionality inquiry in which the value of the property sought to be forfeited is compared to the gravity of the underlying offense to determine whether the forfeiture is grossly disproportional to the gravity of the offense. For the reasons that follow, we affirm the order of the Commonwealth Court, which remanded the matter to the trial court, for further proceedings consistent with our decision.

## I. Factual and Procedural Background

Appellee Elizabeth Young is a 71-year-old grandmother who owned and resided at a house at 416 South 62nd Street in West Philadelphia, Pennsylvania.[2] Appellee

---

[1] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[2] As explained below, the oddity in civil *in rem* forfeiture is that the subject of the forfeiture, and the focus of the litigation, is on the property sought to be forfeited; (continued…)

owned her house for four decades, since the 1970s. In 2006, Appellee purchased a 1997 Chevrolet Venture minivan to meet her transportation needs. In October 2009, Appellee suffered two blood clots in her lungs and was hospitalized through November 2009. Upon her release, Appellee was placed on bedrest and prescribed several medications. During this time, Donald Graham, Appellee's son, then age 50, and two of her grandchildren, resided with her at the house.

On November 10, 2009, Officer Robert Billups, a member of the Narcotics North Division of the Philadelphia Police Department, was conducting an investigation in relation to illegal drug sales from Appellee's house. On that date, Officer Billups and his partner, Officer Kevin Williams, met with a confidential informant who subsequently was observed giving Graham, who was exiting the house, $40 in pre-recorded money in exchange for a small bag of marijuana. Four days later, on November 14, 2009, the officers, with the confidential informant, observed Graham arrive at the house in a grey Chevrolet vehicle, later determined to be Appellee's minivan. After exiting the vehicle, Graham gave the informant another small bag of marijuana in exchange for $40. A similar transaction occurred two days later on November 16, 2009.

On November 19, 2009, members of the Narcotics North Division served and executed a search warrant on the house. During the course of their search of the premises, the officers confiscated a letter addressed to Graham, a scale, numerous new and used plastic packets, and six baggies of marijuana. While Graham was not present at the house when the search was executed, Appellee was present. The officers explained to Appellee, who was provided with a copy of the search warrant, that her son

(…continued)
however, as owner of the subject property, Appellee is the party of interest, and, thus, is the active participant in these proceedings.

had sold drugs from the house and used a vehicle in connection with the sales on several occasions. The officers did not, however, arrest Graham on that date, and he was not charged with a crime based upon these sales.

On December 4, 2009, Officer Nathan London was conducting an investigation of drug dealings from the house and observed an informant approach it. The informant met with Graham at the door of the house, where the informant provided Graham an unknown amount of currency. Graham momentarily re-entered the house, and then handed the informant certain small objects, which later tested positive for marijuana. Approximately one month later, on January 5, 2010, a similar transaction occurred: after an informant met with Officers McClain and Coaxum, he went to the house, Graham exited the side door of the residence, and both men entered Appellee's vehicle. Thereafter, the informant exited the van with a small item which contained a green weed substance. The next day, Officer London returned to the house with Officer Coaxum and observed a similar transaction take place. Specifically, an informant knocked on the door of the house, Graham answered, and allowed the informant to come into the house. Graham exited the house, went to Appellee's van, remained in the vehicle for several minutes, then exited and returned to the house. Shortly thereafter, the informant left the house and provided the officers with a baggie containing small objects which testing later identified as marijuana.

The next day, January 7, 2010, at approximately 4:40 p.m., Officer McClain met with an informant who approached the house, and a similar drug transaction occurred resulting in the informant providing officers with two baggies containing marijuana. Immediately thereafter, at 4:45 p.m., Officer Robinson approached Graham and arrested him. Officer Robinson recovered a sandwich bag containing 4.6 grams of marijuana, one cellular telephone, $176.00 in unmarked currency, and $60.00 in pre-

recorded currency. The police also took from Graham the keys to Appellee's van. The officers then executed a search warrant on the house and recovered 1.3 grams of marijuana from the living room and 8.5 grams from the van. Graham pled guilty to possession of marijuana and possession of marijuana with intent to deliver, and was sentenced to 11 to 23 months house arrest. 35 P.S. §§ 780-113(a)(16), (30).[3] The trial court imposed no fine on Graham.[4]

While the Commonwealth never charged Appellee with any crime, on October 20, 2010, the Commonwealth filed a petition for the forfeiture of Appellee's house and her vehicle under the Controlled Substances Forfeiture Act ("Forfeiture Act"). 42 Pa.C.S. §§ 6801-6802. On May 1, 2012, the Philadelphia County Court of Common Pleas held a hearing, and ultimately ordered the forfeiture of Appellee's house and vehicle.

The trial court determined that the Commonwealth established a nexus between the seized house and the violations of the Controlled Substance, Drug, Device and Cosmetic Act ("Drug Act").[5] In doing so, the court reasoned that, in determining whether a nexus existed, forfeitures are allowed where the Commonwealth demonstrates that the property owner facilitated the sale of drugs or stored the drugs and paraphernalia on his or her property. The court found that Appellee's house and vehicle were used to facilitate illegal drug sales, as the police had observed several drug transactions inside or around Appellee's house and van, and Appellee's son Graham was selling illegal drugs on a regular basis, and, thus, forfeiture of the property was proper.

---

[3] The specific charges filed against Graham are not contained in the record.

[4] Appellee asserts Graham was also charged with criminal use of a communication facility, 18 Pa.C.S. § 7512(a), but this offense does not justify forfeiture under the Controlled Substances Forfeiture Act.

[5] 35 P.S. §§ 780-101 *et seq.*

The trial court also rejected Appellee's statutory innocent owner defense afforded by the Forfeiture Act because, after the police notified Appellee of Graham's drug activities, through the service of search warrants on the property and personally informing Appellee of the activities, she "refused to take any proactive measures or steps to demonstrate her lack of consent to this illegal activity." Trial Court Opinion, 4/3/2013, at 11-12. Further, the trial court offered that Appellee did not leave or vacate the property, or restrict her son's access to her property. Moreover, the court concluded that Appellee "either knew of or consented to her son's illegal activities on the subject properties. . . . [and at best] turned a blind eye to her son's illegal conduct on the property and allowed it to continue over a prolonged period of time." Id. at 14. The court explained that it observed Appellee's demeanor and behavior during the hearing and "simply did not believe [Appellee's] testimony due to blatant inconsistencies." Id.

Additionally, the trial court ruled that the forfeiture did not violate the Eighth Amendment to the United States Constitution as the forfeiture was not grossly disproportionate to the gravity of Graham's offenses, and the court had already found Appellee failed to sustain her burden of establishing an innocent owner defense. In doing so, the court relied upon this Court's case law, discussed below, and looked to the penalty imposed as compared to the maximum penalty allowed, whether the violation was part of a pattern of unlawful behavior, and the harm resulting from the crime charged. The court rejected as irrelevant that Appellee herself was not charged with or convicted of a violation of the Drug Act; it found that for the relevant offenses Graham theoretically could have been charged with, he faced maximum criminal penalties of $80,000, which, according to the trial court, exceeded the combined appraised value of Appellee's home and vehicle. The court noted that, for several years, Graham had continually sold illegal drugs from the property, and that this activity

put "not only Mr. Graham's neighbors in harm's way, but also the officers investigating his unlawful activities and serving warrants in connection with that illegal conduct." *Id.* The trial court deemed this relevant time period as beginning in November 2009 and continuing until April 2011.[6] Thus, the trial court rejected Appellee's statutory defense and constitutional challenge to its order allowing forfeiture of her house and vehicle.

Appellee appealed to the Commonwealth Court, which reversed the trial court, concluding that the lower tribunal applied an erroneous standard for determining whether the forfeiture violated the Eighth Amendment, and that it failed to consider all relevant circumstances in rejecting Appellee's innocent owner defense. Thereafter, we granted review on both issues, which we discuss in turn.

## II. Analysis

### A. Forfeiture

#### 1. Legal Background

---

[6] Over a year after the initial arrest, on April 25, 2011, Officer Jeffrey Walker conducted a third investigation involving Appellee's house. On that date, another individual who was not related to Appellee was observed selling marijuana from the premises, ultimately resulting in the search of the premises and the discovery of marijuana and packaging paraphernalia. These events were initially part of the Commonwealth's forfeiture action as set forth above. However, on October 9, 2013, on appeal before the Commonwealth Court, Appellee applied for extraordinary relief on the basis that Officer Walker, whose testimony had been credited by the trial court, had been indicted on corruption charges that involved planting drugs on suspects. As Officer Walker had conducted the April 25, 2011 search of Appellee's house, the court believed that "fairness" required a remand so that the trial court could re-examine its prior decision. *Commonwealth v. 1997 Chevrolet*, 106 A.3d 836, 847 (Pa. Cmwlth. 2014). The Commonwealth opposed the application for extraordinary relief, claiming that the testimony of Officers Billups and London regarding Graham's seven controlled buys was sufficient to warrant the forfeiture of Appellee's house. On February 19, 2014, the Commonwealth Court listed the appeal for an *en banc* oral argument and, thereafter, the court denied Appellee's application for extraordinary relief. Before our Court, the Commonwealth takes the position that it is not relying upon the events surrounding the third investigation involving Officer Walker, who pled guilty in federal court to crimes committed while on duty as a police officer.

Before reviewing in full the Commonwealth Court's decision below, it is advantageous, and indeed, necessary, to consider the legal background of the Eighth Amendment with respect to forfeitures, including the United States Supreme Court's two foundational decisions upon which its Eighth Amendment jurisprudence is grounded, as well as our Court's pronouncements in this area of the law.[7]

The historical underpinnings of forfeiture law and the Excessive Fines Clause as it has been interpreted by the United States Supreme Court as well as our Court provides a rich, but yet not entirely lucid, backdrop regarding the constitutionality of property forfeiture. Generally speaking, forfeiture involves a taking of property through a forfeiture statute which provides that, when an item is possessed or used in violation of the law, private ownership of the property ceases, and the government becomes the owner of the property. Caleb Nelson *The Constitutionality of Civil Forfeiture*, 125 Yale L.J. 2446, 2456 (2016) (hereinafter "Nelson"). Forfeitures fall into two broad categories: criminal *in personam* forfeitures and civil *in rem* forfeitures. Criminal *in personam* forfeitures arise from criminal proceedings in which the property owner is convicted of a crime. In contrast to the ancient concept of civil *in rem* forfeiture, criminal *in personam* forfeiture is a more recent legal means by which to confiscate property, with the first federal criminal forfeiture statute being the Racketeer Influenced and Corrupt Organizations Act of 1970. 18 U.S.C. § 1963. Conversely, civil *in rem* proceedings, which maintain a centuries-old focus on the property as the offender, do not require a criminal conviction, or even a criminal charge, as demonstrated in the case *sub judice*.[8]

---

[7] The Eighth Amendment, and, specifically, the Excessive Fines Clause, is made applicable to the states through the Fourteenth Amendment to the United States Constitution. *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 433-34 (2001).

[8] Indeed, because the focus in civil *in rem* forfeiture is on property, legal proceedings arising from this fiction often come with odd captions, such as *United States v. 144,774* (continued…)

Thus, criminal *in personam* and civil *in rem* forfeiture are a powerful means by which the state can seize private property. While, in this matter, the forfeiture concerns a civil *in rem* proceeding, the distinction between the two types of forfeiture has played, and continues to play, an important role in this area.

The type of property at issue, at least to some extent, informs a forfeiture analysis. "Contraband" connotes property that is inherently illegal, the mere "possession of which, without more, constitutes a crime." *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699 (1965). Forfeiture of contraband is not subject to Eighth Amendment scrutiny, as removal of such illegal or dangerous property from society is deemed to be purely remedial in nature. *See United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 364 (1984). Conversely, property that is "tainted" by unlawful use, but which is not otherwise illegal to possess, has come to be known as an "instrumentality" of the offense, and, as discussed below, has been a subject of contention as to whether such property is subject to Eighth Amendment protections. Whether property is an instrumentality is determined by evaluating the relationship of the property to the underlying criminal offense.

As noted above, the Eighth Amendment to the United States Constitution prohibits, *inter alia*, the government imposing excessive fines upon the citizenry. It states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. While the "cruel and unusual punishment" clause has generated a significant amount of litigation, the United States Supreme Court has interpreted the Excessive Fines Clause only on rare

---

(…continued)
*Pounds of Blue King Crab, more or less*, 410 F.3d 1131, 1132 (9th Cir. 2005), or the caption in this case.

occasions, and, for many years, that Clause with respect to civil *in rem* forfeitures went unexplored.

In 1993, however, in *Austin v. United States*, 509 U.S. 602 (1991), the United States Supreme Court considered the Excessive Fines Clause in the context of a civil *in rem* forfeiture, finding such forfeiture is subject to the limitations imposed by the Eighth Amendment if it is punitive in nature. In that matter, Richard Lyle Austin was indicted on four counts of violating South Dakota's drug laws. After Austin pled guilty to one count of possessing cocaine with intent to distribute and was sentenced to seven years imprisonment, the United States filed a civil *in rem* proceeding seeking forfeiture of Austin's mobile home and auto body shop, under the applicable federal forfeiture statute. The forfeiture was based upon Austin bringing two grams of cocaine from his mobile home to the auto body shop where he sold the cocaine to a buyer. The high Court granted *certiorari* to determine whether the Eighth Amendment's Excessive Fines Clause applied to civil *in rem* forfeitures.

Writing for the majority, Justice Harry Blackmun rejected the United States' assertion that the Eighth Amendment does not limit the government's conduct in civil proceedings unless the challenged governmental action would have been recognized as a criminal punishment at the time of its adoption and unless that proceeding is so punitive that it must be considered criminal. The Court first noted that, unlike other provisions found in the Bill of Rights, the Eighth Amendment by its terms was not limited to criminal cases. The Court proceeded to consider the purpose behind the Eighth Amendment, which it stated was to "limit the government's power to punish," and that punishment applied to both civil and criminal law. *Austin*, 509 U.S. at 609-10. Thus, the Court found that the focus was on whether the forfeiture was punishment.

After tracing the three kinds of forfeiture established in England at the time the Eighth Amendment was ratified — deodand, forfeiture upon conviction for a felony or treason, and statutory forfeiture — the Court reasoned that each was understood as imposing punishment, at least in part. Tracing its prior case law, the Court found that it had recognized for some time that statutory *in rem* forfeiture imposed punishment, along with the legal fiction that the "thing is primarily considered the offender." *Id.* at 615 (quoting *J.W. Goldsmith, Jr.-Grant Co. v. United States*, 254 U.S. 505, 511 (1921)). Indeed, this fiction enabled courts to expand their reach as, in situations typically arising in admiralty proceedings, courts lacked *in personam* jurisdiction over the owner of the property. *Austin*, 509 U.S. at 616 (citing *Republic National Bank of Miami v. United States*, 506 U.S. 80, 87 (1992)). Yet, the Court observed that the fiction that the object was the offender rested upon "the notion that the owner who allows his property to become involved in an offense has been negligent." *Austin*, 509 U.S. at 616. Thus, the Court reasoned that, even though it had rejected the "innocence" of the owner as a common-law defense to forfeiture, it had recognized that forfeiture generally, and statutory *in rem* forfeiture specifically, had historically intended, at least in part, to punish the owner. Accordingly, the Court concluded that the drug offense forfeiture statutes at issue constituted punishment.

The United States argued that the forfeiture statutes at issue were not punitive, but were remedial, because they removed the "instruments" of the drug trade, thus, protecting the community from ongoing drug dealing. Accordingly, the United States maintained the statutes were not subject to Eighth Amendment scrutiny. The Supreme Court, however, rejected any extension of the idea of a statute being remedial beyond the application to the contraband seized. Consistent therewith, the Court went on to find the mobile home and auto shop at issue, like the automobile at issue in its earlier

decision involving the transportation of illegal liquor, not immune from Excessive Fines Clause examination. *Austin*, 509 U.S. at 621; *One 1958 Plymouth Sedan*, 380 U.S. at 699.[9]

Ultimately, the Court reasoned that forfeiture that "constitutes 'payment to a sovereign as punishment for some offense'" is subject to the protections and limitations found in the Excessive Fines Clause of the Eighth Amendment. *Austin*, 509 U.S. at 622. Critically, however, the Court declined to establish a definitive test for determining when a forfeiture is constitutionally excessive, but remanded the matter, leaving the development of the applicable considerations for evolution in the lower courts.

Important to our Commonwealth's experience in interpreting the Excessive Fines Clause, and our analogous Pennsylvania Constitution provision, Justice Antonin Scalia penned an opinion concurring in part and concurring in the judgment. He first explained that, at the time of the drafting of the Eighth Amendment, fines were understood to be a payment to a sovereign as punishment for some offense, and that the taking of lawful property must be considered, in part or in whole, punitive. Justice Scalia, however, went further than the majority and offered that, in his view, the test for constitutional excessiveness was straight forward. He opined that whether *in rem* forfeiture violated

---

[9] In *One 1958 Plymouth Sedan*, where an automobile, carrying 31 cases of liquor not bearing Pennsylvania tax seals, was stopped without probable cause or reasonable suspicion, the United States Supreme Court determined that, while technically a civil proceeding, the forfeiture in substance and effect was criminal in nature; rejected the argument that the exclusionary rule applied only to criminal prosecutions and was not applicable in forfeiture proceedings; and concluded that the exclusionary rule was applicable to such forfeiture proceedings. *One 1958 Plymouth Sedan*, 380 U.S. at 702. In doing so, the high Court specifically rejected the Commonwealth's contention that the automobile was contraband, finding "[t]here is nothing even remotely criminal in possessing an automobile. It is only the alleged use to which this particular automobile was put that subjects [the property owner] to its possible loss [as compared to the forfeiture of the illegal liquor itself]." *Id.* at 699.

the Eighth Amendment turned solely on whether the confiscated property had a close relationship to the offense. As discussed in greater detail below, in Justice Scalia's view, the value of the property was irrelevant, and if there existed a close enough relationship between the property and the offense, the forfeiture passed constitutional muster.

Five years later, in *United States v. Bajakajian*, 524 U.S. 321 (1998), the high Court again spoke to the Excessive Fines Clause, albeit in the context of a criminal *in personam* forfeiture statute. In that matter, Hosep Bajakajian attempted to leave the United States with $357,144 in currency without reporting the funds as required by federal law. *See* 31 U.S.C. § 5316(a)(1)(A) (requiring the reporting of the transfer outside of the United States of monies in excess of $10,000). Federal forfeiture law provided that an individual convicted of willfully violating the reporting provision should forfeit to the government "any property . . . involved in such offense." 18 U.S.C. § 982(a)(1). The United States sought forfeiture of the entire $357,144, and Bajakajian challenged the forfeiture as violative of the Excessive Fines Clause. The federal district court determined that the entire amount was subject to forfeiture, as it was "involved in" the offense, even though the funds were not connected to any other crime and even though they were being transported to repay a lawful debt. The district court, however, determined that such forfeiture would be "extraordinarily harsh" and "grossly disproportionate to the offense in question," and, thus, violated the Excessive Fines Clause. *Bajakajian*, 524 U.S. at 326. Instead, the court ordered the forfeiture of $15,000.

On appeal, the Court of Appeals for the Ninth Circuit affirmed. The circuit court reasoned that a forfeiture must fulfill two conditions: first, the property forfeited must be an instrumentality of the crime committed, and, second, the value of the property must

be proportional to the culpability of the owner. The circuit court concluded that the currency was not an instrumentality of the reporting crime, as it was the withholding of information, rather than the possession of the money, that ran afoul of the law. According to the circuit court, the forfeiture statute involving currency could never satisfy the Excessive Fines Clause, and thus it was unnecessary to consider the proportionality condition. The Supreme Court granted *certiorari* to consider the *per se* nature of the court of appeals' holding, which invalidated a portion of the statute.

In a 5-4 decision, with Justice Clarence Thomas writing for the majority, the United States Supreme Court affirmed. The high Court first made clear that the forfeiture of currency pursuant to Section 982(a)(1) constituted punishment, thus implicating the Excessive Fines Clause. *Id.* at 329. The Court reached this conclusion by tracing the history of forfeitures, and concluding that, because *in rem* forfeitures were traditionally viewed as non-punitive, and the conduct of the property owner irrelevant as the focus of the action was on the property, they were not encompassed by the Excessive Fines Clause. The Court went on, however, to find that the forfeiture in the matter before it "does not bear any of the hallmarks of traditional civil *in rem* forfeitures," *id.* at 331, but, rather, was born from a criminal *in personam* forfeiture, and imposed at the culmination of criminal proceedings. Thus, for purposes of the threshold issue of Eighth Amendment protection, the Court reasoned that, while instrumentalities were historically considered a form of "guilty" property, here, the forfeiture was a criminal *in personam* proceeding; thus, it was irrelevant whether Bajakajian's currency was an instrumentality.[10] The Court concluded, however, that, in any event, the currency was

---

[10] The Court noted, however, that, because recent forfeiture laws blurred the civil *in rem* and criminal *in personam* distinction, a modern statutory forfeiture is a "fine" for purposes of the Eighth Amendment if it constitutes punishment, even in part, regardless of its label, citing *Austin. Bajakajian*, 524 U.S. at 331 n.6.

not an instrumentality. Rather, the Court found that the forfeiture was punitive, and that being the case, the test for excessiveness of a punitive forfeiture involved "solely a proportionality determination." *Id.* at 333-34.

The Court explained the proportionality concept by offering that "[t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish," and, more specifically, "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 334. Finding that neither the text of the Excessive Fines Clause, nor the history behind it, identified how proportional to a criminal offense the fine must be, the court went on to find "particularly relevant" two factors to be considered in divining constitutional excessiveness: first, judgments about the appropriate punishment for an offense belong in the first instance to the legislature; and, second, any judicial determination regarding the gravity of a particular criminal offense will be inherently imprecise. Together, these considerations counseled against requiring any strict proportionality between the amount of the punitive forfeiture and the gravity of the criminal offense, leading to the adoption of the grossly disproportionate standard. *Id.* at 336.

Applying this standard, the Court concluded that the forfeiture of the entire $357,144 would have been excessive, as Bajakajian's crime was merely one of a failure to report, and his violation was unrelated to any other criminal activity. The Court looked to the sentencing guidelines, offering that the maximum sentence Bajakajian faced under the federal sentencing guidelines was six months imprisonment and the maximum fine was $5,000. *Id.* at 338. Indeed, the Court rejected the United States' argument that the proper approach focused on the maximum statutory penalty permitted, and, its argument that the forfeiture was not excessive, as Congress authorized a maximum fine of $250,000 plus five years imprisonment for willfully

violating the reporting requirements. Instead, the Court reasoned that the fact that the maximum punishment that Bajakajian faced under the guidelines was but a fraction of the penalties authorized by the statute demonstrated his culpability relative to other potential violators of the reporting provision — such as "tax evaders, drug kingpins, or money launderers" — was small. *Id.* at 339 n.14. Further, the Court offered that the harm that Bajakajian caused was minor, as it impacted only the government, and in relatively minimal fashion. Thus, the Court concluded that, when comparing the gravity of Bajakajian's crime with the $357,144 sought by the government for forfeiture, such a forfeiture would be grossly disproportionate. Finally, the Court rejected the United States' reliance upon early statutory enactments requiring full forfeiture of goods involved in customs offenses, as such statutes were not considered punishment for a criminal offense because they rested upon the theory of guilty property; thus, according to the Court, they revealed nothing about the proportionality of the punitive forfeiture at issue in the matter before it.

It is these two United States Supreme Court pronouncements considering the Excessive Fines Clause that serve as the bedrock constitutional foundation regarding forfeiture from which any analysis must be based. With these decisions in mind, we turn to the decisions of our Court which have applied them.

After *Austin*, but prior to *Bajakajian*, this Court decided *In re King Properties*, 635 A.2d 128 (Pa. 1993). In an opinion authored by Justice John Flaherty, we considered the question of whether Article I, Section 13 of the Pennsylvania Constitution — our Commonwealth's excessive fines clause — mandated that owners of real property forfeited under the Forfeiture Act be permitted to redeem their property in order for the

statute to pass constitutional muster.[11]  In *In re King Properties*, police found a large sum of cash and items commonly used in the selling of illegal drugs in Coy King's home.  The Commonwealth sought the forfeiture of the house, and, while the trial court found that King's entire interest in the house was subject to forfeiture, it granted King the right to redeem the property for $30,000.  On appeal, the Commonwealth Court reversed, finding the trial court was not authorized to permit King's redemption.

In contemplating this question of authority on appeal, our Court first considered whether redemption is required by our Constitution's prohibition on excessive fines. The Court noted the Eighth Amendment and Article I, Section 13 were virtually identical, and, thus, looked to federal treatment of the United States Constitution's excessive fines provision.  Our Court, relying upon *Austin*, determined that the forfeiture before it, which was similar to that at issue in *Austin*, was punitive, and, thus, subject to the protections of the Pennsylvania Constitution.  Turning to consideration of what factors were appropriate under Article I, Section 13, the Court adopted Justice Scalia's standard for determining whether a forfeiture was excessive — that the inquiry does not concern the value of the property forfeited, but, rather, the nexus between the offense and the subject property.  Placing the burden on the Commonwealth to establish the relevant pattern of criminal conduct, the Court found that there was "clear and convincing evidence that King was involved in an ongoing drug business for which he used his house as a base of operations.  King admitted involvement in unlawful drug sales and was in the possession of large amounts of cash, drugs, and drug paraphernalia, all of which were found either in his house or his car."  635 A.2d at 133.  This, according to the Court, established a sufficient connection between the criminal conduct in question

_____

[11] Redemption refers to the right of the former property owner to regain ownership of his or her property through payment to the Commonwealth.

and King's house, and, thus, the forfeiture of this property (without the right of redemption) was not an excessive fine under the Pennsylvania Constitution.[12]

A decade later, after the United States Supreme Court rendered its decision in *Bajakajian*, our Court revisited this area of the law in *Commonwealth v. 5444 Spruce Street*, 832 A.2d 396 (Pa. 2003). In *5444 Spruce Street*, with Justice William Lamb writing for the Court, we considered whether the civil *in rem* forfeiture of a house in Philadelphia owned by Elizabeth Lewis, who pled guilty to a single charge of possession with intent to deliver a controlled substance and who was sentenced to two years probation, was unconstitutional. Again, accepting that Article I, Section 13 of the Pennsylvania Constitution was coextensive with the Eighth Amendment to the United States Constitution, the Court analyzed the issue under our state constitution using Eighth Amendment jurisprudence. The Court surveyed our prior decisions, noting that they turned on whether the forfeited property was significantly related to the underlying criminal activity. Specifically, the Court drew the distinction, based upon pre-*Bajakajian* case law, that we had allowed forfeiture when the property forfeited was "significantly related to the criminal offense," but disallowed it when the property forfeited was "not significantly related to the criminal activity." *Id.* at 400. Recognizing that *Bajakajian* involved a criminal *in personam* forfeiture, the Court nevertheless considered whether the *Bajakajian* gross disproportionality test applied to a punitive civil *in rem* forfeiture "where the government has established a significant relationship between the property sought to be forfeited and the underlying criminal offense." *Id.*

---

[12] Moreover, the Court found that there was no statutory language permitting redemption, and, thus, that the only way for one to obtain the forfeited property was by purchasing it at a subsequent sale. *Id.*

After tracing the legal construct adopted by the United States Supreme Court in *Bajakajian*, our Court offered that both *Bajakajian* and our decision in *In re King Properties* began at the same point — that forfeitures are fines for Eighth Amendment purposes if they constitute punishment for an offense, regardless of whether the action is characterized as *in rem* or *in personam*. The *5444 Spruce Street* Court continued that the next step was consideration of whether the fine — here, the forfeiture — was excessive. We noted that the *Bajakajian* Court found that the amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish, ultimately determining that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportionate to the gravity of a defendant's offense. In conducting this disproportionality analysis, we interpreted the *Bajakajian* Court as placing the primary emphasis on the culpability of the defendant, rather than on the severity of the crime in the abstract. *Id.* at 401.

The high Court's analysis, we explained, warranted consideration of three factors, each of which were focused on the conduct of the defendant: "the penalty imposed as compared to the maximum penalty available; whether the violation was isolated or part of a pattern of misbehavior; and, the harm resulting from the crime charged." *Id.* at 402. Ultimately, our Court did not adopt specific factors to be considered in an excessiveness analysis, concluding that the question of the proper approach had not gone through the "sharpening and annealing process of litigation in the lower courts." *Id.* at 402 n.7. Nevertheless, we held that *Bajakajian*'s gross disproportionality test applied to all punitive forfeitures regardless of the form of the underlying proceedings, and overruled *In re King Properties* to the extent it held otherwise.

Deconstructing the above seminal decisions by the United States Supreme Court and our Court, we observe that certain concrete principles emerge, while other issues remain open. Specifically, it is now accepted that the Eighth Amendment's Excessive Fines Clause applies to civil *in rem* forfeitures that are punitive and criminal *in personam* forfeitures. *Austin*; *Bajakajian*. With respect to criminal *in personam* forfeitures, an Excessive Fines Clause inquiry focuses on proportionality, and, specifically, to survive an excessiveness challenge, the amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish. *Bajakajian*, 524 U.S. at 334. Whether a criminal *in personam* forfeiture is excessive requires consideration of whether the forfeiture is "grossly disproportional" to the gravity of a defendant's offense. *Id.* With regard to the gross disproportionality standard, the *Bajakajian* Court warned that judgments regarding the appropriate punishment for an offense belong initially to the legislature, and judicial determinations regarding the gravity of an offense will be "inherently imprecise." *Id.* at 336. In applying the gross disproportionality standard, the amount of the forfeiture is compared to the gravity of the offense, and if the amount is grossly disproportionate, it is unconstitutional. In judging the gravity of the offense, we look to the culpability of the defendant rather than the severity of the crime in the abstract. *5444 Spruce Street*, 832 A.2d at 401. In Pennsylvania, the gross disproportionality test is applicable to all punitive forfeitures, including civil *in rem* proceedings. *Id.* at 403. In this regard, the following three, non-exhaustive, factors have been considered: the penalties that the legislature has authorized compared to those to which the defendant was subjected; whether the violation was isolated or part of a pattern of misbehavior; and the nature of the harm caused by the defendant. *Bajakajian*, 524 U.S. at 338-39; *5444 Spruce Street*, 832 A.2d at 402.

In the wake of *Bajakajian* and *5444 Spruce Street*, however, certain issues remain open. First, answering the question of whether, as part of the excessiveness analysis, a court must find as a threshold matter that the property sought to be forfeited is an instrumentality of the underlying offense is not clear cut. Further, federal and state courts have adopted a variety of considerations in determining whether a forfeiture is constitutionally excessive. Critically, while many courts have relied, in whole or in part, on the factors articulated in *Bajakajian*, no definitive set of factors has emerged to be used in making the grossly disproportionate analysis. *Id.* at 402.

### 2. Commonwealth Court Decision

With this background in mind, we turn to the Commonwealth Court's decision in the matter *sub judice*. On December 17, 2014, an *en banc* Commonwealth Court, in a published opinion authored by then-Judge, now President Judge Mary Hannah Leavitt, and over a dissent, reversed the trial court's granting of the Commonwealth's petition for forfeiture. *Commonwealth v. 1997 Chevrolet*, 106 A.3d 836 (Pa. Cmwlth. 2014).

The court initially set forth the factual predicate for both the criminal activity underlying the forfeiture, and the testimony regarding Appellee's role as property owner. The court, noting that the Eighth Amendment serves to limit the power of the government to punish its citizens, offered that the central question in the appeal was whether the forfeiture of Appellee's home and vehicle imposed an excessive fine on her. The Commonwealth Court went on to survey the above case law from the United States Supreme Court as well as our Court's decisions interpreting the Eighth Amendment. Reconciling these decisions, the Commonwealth Court found that, for a civil forfeiture brought under the Forfeiture Act to survive an Eighth Amendment challenge, the Commonwealth must show, initially, that the forfeitable property was the instrumentality

of the offense. *1997 Chevrolet*, 106 A.3d at 858-59, 866. The Commonwealth Court also found it necessary to consider the property owner's level of involvement — culpability — in the criminal activity, relying upon the Second Circuit Court of Appeals' decision in *von Hofe v. United States*, 492 F.3d 175 (2d Cir. 2007), discussed below. *1997 Chevrolet*, 106 A.3d at 859-862, 866.

Next, the court noted that the Commonwealth must show that the amount of the forfeiture, or punishment, is proportional to the gravity of the offense, determined by using what the Commonwealth Court characterized as the *Bajakajian* "three-prong test," *id.* at 850, 863-64 — that is, "the penalty imposed as compared to the maximum penalty available; whether the violation was isolated or part of a pattern of misbehavior; and, the harm resulting from the crime charged." *5444 Spruce Street*, 832 A.2d at 402.

The Commonwealth Court went on to reconsider the method for establishing the gravity of the offense aspect of the analysis, as well as how to apply the *Bajakajian* test where the owner of the forfeited property was not charged with, or convicted of, a crime. After considering, and rejecting, its own decisional law, the Commonwealth Court opined that the amount of the forfeiture — the value of the property — is not the "penalty" for the assessment of the first factor in determining the gravity of the offense. Rather, the penalty in this context is the criminal penalty actually imposed for the related offense. *1997 Chevrolet*, 106 A.3d at 864. The court reasoned that it is only after the gravity of the offense is established that the actual amount of the forfeiture is compared to the gravity of the offense. Thus, the court found the Commonwealth must present evidence as to Graham's actual criminal history, i.e., the charges filed against Graham, the actual penalty imposed, and the maximum penalty on the charges for which Graham was convicted. *Id.* at 683. Turning to the second factor, the court found the trial court needed to consider whether Graham's conduct was extensive in space and time and

had to relate the misbehavior to the subject property. Additionally, the trial court was instructed to consider to what extent Graham's pattern of misbehavior was due to the police sending its informant to Appellee's house, rather than a distinct location. Further, regarding the third factor, the court concluded that evidence is required of the specific harm caused by the offense, including the type and quantity of drugs sold, the use of illegal drugs by purchasers, and the impact of the sales upon the neighborhood, without reliance upon general or "self-evident" harm. Ultimately, the Commonwealth Court rejected the trial court's gravity of the offense analysis and determined that a proper Eighth Amendment analysis required an initial assessment of instrumentality, Appellee's culpability, and a determination of the gravity of the defendant's offense by analyzing the actual penalty imposed upon the defendant, the extensiveness of the defendant's conduct, and the actual harm caused by the illegal conduct. As there was insufficient evidence of record regarding this approach, and the trial court did not analyze the excessive fines inquiry in these terms, the Commonwealth Court remanded for further proceedings consistent with its opinion.[13]

Judge Robert Simpson authored a dissenting opinion, joined by Judge Bonnie Brigance Leadbetter. The dissenters objected to what they believed to be the overruling of the court's prior *en banc* decision in *Commonwealth v. 542 Ontario Street*, 989 A.2d 411 (Pa. Cmwlth. 2010), and would have embraced that decision's approach, which examines the property owner's conduct and the value of the property in comparison to

---

[13] Then-President Judge Dan Pellegrini penned a concurring opinion offering that the Commonwealth should meet its burden in a forfeiture case by clear and convincing evidence, rather than the preponderance of the evidence standard, but acknowledged that answering that issue was unnecessary to the resolution of the appeal. The majority did not address the issue, as it was not squarely raised. As the issue was not addressed below, and not challenged on appeal, we decline to address any change in the current preponderance of the evidence standard.

the maximum statutory penalty for the underlying criminal conduct. *1997 Chevrolet*, 106 A.3d at 882 (Simpson, J., dissenting).

As noted, we accepted allocatur to address the appropriate standard for determining whether a civil *in rem* forfeiture violates the Excessive Fines Clause of the United States Constitution. This constitutional issue raises a pure question of law, and, thus, our standard of review is *de novo* and our scope of review is plenary. *5444 Spruce Street*, 832 A.2d at 398. We begin by reviewing the parties' respective arguments.

### 3. Argument of the Parties

As Appellant, the Commonwealth initially stresses that Appellee owned the property from which her adult son repeatedly sold marijuana, and that, after the police informed her of this activity, she did not take any steps to terminate the sales, justifying the forfeiture of her home and vehicle. The Commonwealth characterizes the Commonwealth Court's decision below as inventing a new test for an excessive fine analysis under the Eighth Amendment, and, like the dissent below, accuses the lower court of imposing "new, baseless standards for reviewing a challenge to a statutory forfeiture under the Excessive Fines Clause . . . . [and claiming the] Commonwealth Court's real agenda is to imperil civil forfeiture in the absence of a criminal conviction, contrary to settled law." Commonwealth's Brief at 14. The Commonwealth emphasizes that, while forfeiture statutes have certain punitive aspects, they also serve non-punitive goals such as encouraging owners to properly manage their property, ensuring that it is not used for illegal purposes, and ensuring that persons do not profit from illegal activities. The Commonwealth warns that the lower court's undermining of civil forfeiture law will be suffered by "the innocent neighbors of drug peddlers." *Id.*

Specifically, the Commonwealth maintains that the Excessive Fines Clauses of the United States and Pennsylvania Constitutions are coextensive, and that the United States Supreme Court in *Bajakajian* found forfeiture to be constitutionally impermissible only if the forfeited amount was grossly disproportional to the gravity of the offense on which the forfeiture was based. Stated another way, the Commonwealth asserts that the Constitution permits civil *in rem* forfeiture if the *res* is an instrumentality or its value is not grossly disproportional to the gravity of the underlying offense. The Commonwealth contends that our Court has applied the *Bajakajian* standard to *all* punitive forfeitures, and made this the exclusive test in Pennsylvania, citing *5444 Spruce Street*. According to the Commonwealth, the Supreme Court in *Bajakajian* specifically rejected a requirement that the forfeited property had to be an instrumentality of the crime. Thus, the Commonwealth claims that the appropriate standard as articulated by the United States Supreme Court, and our Court, is that a statutorily-permitted forfeiture is constitutional if the property is either an instrumentality of the crime committed — that is, the forfeiture is non-punitive and, thus, not subject to constitutional scrutiny as it is remedial in nature — or satisfies the gross disproportionality test. The Commonwealth goes on to argue that the Commonwealth Court improperly limited *Bajakajian*'s rejection of the property having to be an instrumentality of the underlying offense to criminal *in personam* forfeitures, and asserts that, to the contrary, the *Bajakajian* approach applies to both civil *in rem* and criminal *in personam* forfeitures, which was made clear by our Court in *5444 Spruce Street*. Thus, the Commonwealth urges that, consistent with *Bajakajian*, our Court should reiterate that a civil *in rem* forfeiture passes constitutional muster if the property is *either* an instrumentality *or* the forfeiture is not grossly disproportional to the gravity of the offense.

With respect to the gross disproportionality test, and, specifically, consideration of the culpability of the property owner, the Commonwealth develops that the Commonwealth Court's standard is unworkable, and accuses the Commonwealth Court of legislating by imposing a culpability requirement that requires direct knowledge and active participation in the underlying offense by the property owner. More precisely, the Commonwealth offers that justification for civil *in rem* forfeiture of non-instrumentalities rests on the notion that the owner of the property is negligent. Thus, in the Commonwealth's view, where the property owner has done all that he or she can reasonably do to prevent the criminal use of his or her property, forfeiture should be denied. This standard, according to the Commonwealth, would induce the owner to exercise greater care in allowing his or her property to be used by those who may commit a crime. Moreover, the Commonwealth offers that owner culpability is accounted for in the Forfeiture Act through the innocent owner defense, as the property is exempt from forfeiture if the owner did not know about or consent to the properties' illegal use. 42 Pa.C.S. §§ 6801(a)(6)(ii), 6802(j). Accordingly, the Commonwealth contends that it would be duplicative to make relative culpability a factor in the Bajakajian balancing analysis where the innocent owner defense is available, and maintains that, where the innocent owner defense has been defeated, the constitutionally mandated level of negligence has been established.

The Commonwealth also argues that *von Hofe*, the Second Circuit Court of Appeals decision relied upon by the Commonwealth Court which introduced consideration of owner culpability, is inapplicable to the extant circumstances, and should not have been adopted by the Commonwealth Court, as, here, the property owner was willfully blind to the drug activity on her property, thus, satisfying the requirement of at least negligence. Further, the Commonwealth claims that the

Commonwealth Court actually expanded the *von Hofe* construct, requiring it to establish that the property owner "participated in the offense" prior to forfeiture, *1997 Chevrolet*, 106 A.3d at 862, and that such participation was significant. Commonwealth's Brief at 27. In this regard, the Commonwealth maintains that Appellee had the ability to "prohibit the drug sales from her property, but chose to permit them instead, even after being warned by a police officer" of her son's activities. According to the Commonwealth, rather than doing what "she reasonably could under the circumstances, she did nothing. By failing to responsibly exercise control over her property, [Appellee] forfeited her right as the owner." *Id.* at 28. The Commonwealth asserts it had an "enforceable interest" to protect "the truly innocent property owners in the neighborhood from [Appellee's] enablement of drug peddling." *Id.*[14]

Moreover, the Commonwealth challenges the Commonwealth Court's introduction of a subjective test for constitutional excessiveness.[15] Specifically, the Commonwealth offers that our Court, in *5444 Spruce Street*, recognized various approaches to the United States Supreme Court's balancing test: "(1) a 'multi-faceted measuring' of the value of the property to the gravity of the offense; (2) a comparison of the value of the property to a 'subjective estimation of the gravity of the offense;' (3) a 'more objective standard' which 'look[s] first to the legislative body which has specified the maximum permissible fine for a given offense, holding that if the value of forfeited

---

[14] We discuss this "innocent owner" defense below.

[15] The Attorney General writing in support of the Commonwealth also takes the Commonwealth Court to task, suggesting that, in its opinion, it "re-writes the controlling test for excessive fines" and warns that the detrimental effects of the lower court's decision will include the "likely increase in the number of sham or strawman owners in forfeiture cases." Attorney General's Brief at 8. The Attorney General also points to the laudable goals of the Forfeiture Act, including the elimination of economic incentives of drug-related activity and the discouragement of such conduct.

property is within the range of fines prescribed . . . a strong presumption arises that the forfeiture is constitutional;' and (4) an outlier approach adopted in Utah that 'considered the effect of the forfeiture on the' claimant and which had been 'specifically rejected' in more jurisdictions than it had been adopted." *5444 Spruce Street*, 832 A.2d at 402 n.7; Commonwealth's Brief at 29-30.

The Commonwealth traces the experience of these tests in the Commonwealth Court, noting that the court has rejected its prior "objective" test, based upon statutory maximum penalties embraced most recently in *542 Ontario Street*, and replaced it with the more subjective test followed in Utah, *State v. Real Property at 633 East 640 North, Orem, Utah*, 994 P.2d 1254, 1257 (Utah 2000). Yet, the Commonwealth highlights that this subjective standard, which includes weighing the effect of the forfeiture on the owner, was not only originally adopted before the Supreme Court's decision in *Bajakajian*, but was similar to the Ninth Circuit's decision in *Bajakajian* which the high Court rejected. Moreover, the Commonwealth offers, as noted above, that our Court in *5444 Spruce Street* had expressed reservations about such a subjective approach, including the weighing of the effect of the forfeiture on the owner, as it had been adopted only in a minority of jurisdictions. The Commonwealth claims that such an approach is not faithful to *Bajakajian*, which, as noted above, offered that the appropriate punishment was initially for the legislature, and that any determination by the courts regarding the gravity of a particular offense will be "inherently imprecise." Commonwealth's Brief at 33 (quoting *Bajakajian*, 524 U.S. at 336). The Commonwealth ultimately advocates that, where the value of the property is below the statutory maximum fine applicable to the drug crime the property facilitated, the forfeiture is constitutional, and this, according to the Commonwealth, places an effective limit on forfeitures.

The Commonwealth also takes issue with the Commonwealth Court requiring specific harm from the underlying offense, and its suggestion that the drug sales at issue in this appeal were not harmful due to the use of confidential informants. The Commonwealth urges that the legislature made drug sales illegal because they harmed individuals and society as a whole, and that such harm must have some weight in favor of forfeiture. Moreover, the Commonwealth asserts the Commonwealth Court's finding of less harm due to the sale of drugs to informants illogically assumes that in this matter Appellee's son sold only to buyers who were informants and that he intended to sell only to them, rather than to others.

Consistent with this approach, the Commonwealth further challenges the Commonwealth Court's comparison of the fine imposed in the underlying criminal offense to the statutory maximum to assess the relative gravity of the crime charged for purposes of forfeiture, and instead urges the "main" comparison should be between the amount of the forfeiture and the statutory maximum fine for the underlying criminal offense. Commonwealth's Brief at 38-39.

The Commonwealth offers that the trial court, by conducting an objective balancing test, properly considered only whether the amount of the forfeiture was grossly disproportionate to the gravity of the defendant's offense for purposes of constitutional challenge. According to the Commonwealth, the amount of the forfeiture need bear only some relationship to the gravity of the offense and not an exact one. The Commonwealth submits that the proper balancing test compares the fair market value of the forfeiture to the applicable fine. Under this approach, the Commonwealth asserts that Appellee's appraisal of her house in the amount of $54,000 (which it contends is the high-end estimate) is compared to the maximum statutory fine for the crime of possession with intent to sell marijuana, $15,000, and the maximum

imprisonment for the crime of five years. 35 P.S. § 780-113(f)(2). According to the Commonwealth, this aggregate applicable fine for each of the proven sales (seven sales) totals $105,000. The Commonwealth submits that, even if the sales were limited to the period of December 2009 through January 2010, when the Commonwealth claims Appellee was on notice of her son's selling of marijuana from her house, the aggregate maximum applicable fine would be $45,000 for the illegal drug sales from the house, and an additional $15,000 for each sale from the vehicle and the bulk marijuana found in the living room when the search warrant was executed. These aggregate fines were in excess of $75,000, which, according to the Commonwealth, were substantially less than the statutory maximums for the underlying crimes, but exceeded the value of the house and van. Thus, in its view, this first inquiry weighs in favor of finding the forfeiture to be permissible.

The Commonwealth turns to the second factor under *Bajakajian*, which is the connection of the property to the crime. The Commonwealth points to a pattern of selling drugs from Appellee's house from November 2009 through January 2010, that it was used to facilitate at least seven sales during two police investigations, and that the vehicle was used for three transactions. The Commonwealth maintains that it took multiple police investigations and two search warrants to disrupt the sale of illegal drugs from the house, which supports the conclusion that the house was the focus of the drug trade and substantially connected to the illegal activity, thus, weighing in favor of forfeiture. The Commonwealth goes on to argue that the trial court's rejection of Appellee's innocent owner defense gives rise to a presumption that Appellee was responsible for the manner in which the house was used, and, this, according to the Commonwealth, is buttressed by Appellee's failure to provide any evidence that she tried to stop the sale of drugs from her house. Moreover, the Commonwealth contends

that the trial court found sufficient evidence of substantial harm caused by the underlying crimes, including neighbors and police being placed in harm's way, and the intransigent nature of the sale of drugs from the house requiring a need for repeated police surveillance. Additionally, the Commonwealth presses it is proper to accept an inference of harm from drug trafficking in a residential neighborhood, and all of these considerations weigh in favor of forfeiture.[16]

Appellee counters, initially offering that the Commonwealth Court properly required the property to be an instrumentality of the underlying crime. First, Appellee argues that civil *in rem* forfeitures, as discussed above, were historically limited to instrumentalities of the underlying offense, stemming from the idea that the property itself was guilty of the crime, and that this notion persists in the United States Supreme Court's jurisprudence, as the *Bajakajian* Court noted civil *in rem* forfeiture proceedings subjected the property to forfeiture because it was the actual means by which the offense was committed. *Bajakajian*, 524 U.S. at 333 n.8. Appellee stresses that the instrumentality requirement serves to maintain the distinction between civil *in rem* and criminal *in personam* forfeitures, noting that criminal *in personam* forfeitures carry with them substantial constitutional protections for a criminal defendant which a civil *in rem* forfeiture property owner does not enjoy. Appellee points to Justice Scalia's concurrence in *Austin*, which urged that excessiveness for civil *in rem* forfeitures depended only upon the relationship between the property and the underlying crime, and the fact that the *Austin* majority specifically left open the issue of an instrumentality requirement. Appellee also maintains that the Commonwealth Court was correct when it opined that *Bajakajian* did not rule out an instrumentality requirement for civil *in rem*

---

[16] *Amicus* District Attorney's Association has also filed a brief which largely tracks the arguments made by the Commonwealth and the Attorney General.

procedures, but, rather, only clarified that it was not a consideration in criminal *in personam* forfeitures.

Moreover, Appellee contends that the *Bajakajian* Court went to great lengths to distinguish civil *in rem* and criminal *in personam* forfeitures. As the forfeiture in *Bajakajian* was a criminal *in personam* forfeiture, according to Appellee, the Court found it to be irrelevant whether the currency was an instrumentality. Regarding our Court's case law, Appellee argues that our Court adopted Justice Scalia's concurrence in *In re King Properties*, 635 A.2d at 133, and contends that in *5444 Spruce Street*, we premised our post-*Bajakajian* analysis on the notion that an *in rem* forfeiture was constitutional only if there was a "significant relationship" between the property and the underlying criminal offense. *5444 Spruce Street*, 832 A.2d at 429-30. According to Appellee, the *5444 Spruce Street* Court retained the *In re King Properties* "significant relationship" requirement as a threshold issue, and adopted the *Bajakajian* gross disproportionality test as an additional requirement for Excessive Fines Clause purposes.

Appellee also offers that other courts have retained the instrumentality requirement for civil forfeitures post-*Bajakajian*. Specifically, Appellee points to the Second Circuit's decision in *von Hofe* in which the court required that, when considering "the property's guilt, then, one needs to examine the relationship between the property and the criminal offense." *von Hofe*, 492 F.3d at 184-85. Similarly, Appellee points to the Utah Supreme Court's decision in *Real Property at 633 East 640 North*, *supra*, in which the court found the instrumentality question to be the starting point, followed by the gross disproportionality test. Finally, Appellee adds in the alternative that, even if not a threshold requirement, whether the property was an instrumentality in the underlying crime is properly considered a factor in an excessive fine analysis.

With respect to culpability, Appellee argues that the Commonwealth Court properly determined that the Excessive Fines Clause requires consideration of the relative culpability of the property owner, and not just that of the criminal defendant, and that, here the trial court failed to engage in such an analysis. Appellee asserts that the Commonwealth has offered a circumscribed gross disproportionality test focusing only three objective factors: the maximum penalties available, whether the violation was related to other illegal activities, and the resulting harm, citing Commonwealth's Brief at 29. According to Appellee, our Court in *5444 Spruce Street* did not place any such limitations on what a trial court may consider, instead allowing for further "sharpening and annealing" of relevant factors in the lower courts. 832 A.2d at 402 n.7. Appellee offers that the Commonwealth Court recognized the desirability of a flexible test in ascertaining whether the property owner deserves the punishment of forfeiture. Appellee stresses that the degree of culpability of the property owner must be considered, rejecting the Commonwealth's focus on a comparison of the objective value of the property against the maximum statutory fine applicable to the criminal activity that the property facilitated.

Furthermore, Appellee challenges the Commonwealth's contention that a property owner is culpable when merely negligent and that this mandate is satisfied by a trial court's rejection of the statutory innocent owner defense. Specifically, Appellee offers that, historically, courts did not consider whether the property owner was negligent when another person used his or her property for criminal activity, but, rather, the criminal use of the property led *ipso facto* to the conclusion that the property owner was negligent. According to Appellee, this legal justification for forfeiture of one's property, however, is not synonymous with holding a property owner culpable for purposes of the Eighth Amendment whenever property is used in a crime. Moreover,

Appellee claims that, an Eighth Amendment analysis is independent from any statutory defense and that a forfeiture that survives an asserted statutory innocent owner defense may nevertheless violate the Constitution. In making this point, Appellee draws the distinction between the legislature's intention to protect innocent property owners and the constitutional protection of an individual against excessive punishment.

Appellee maintains the excessive fines analysis is not limited to objective criteria as asserted by the Commonwealth, as pure objectivity ignores the significant interest that individuals have in their property, upon which their livelihood often depends. Rather, Appellee claims the excessiveness inquiry requires a subjective proportionality analysis specific to the crime committed and the property's role therein. Appellee goes on to contend that, even if the factors expressly offered in *Bajakajian* were the exclusive elements of an Excessive Fines Clause analysis, the Commonwealth Court correctly reversed the trial court's application of that test. Specifically, Appellee asserts that both our Court and the United States Supreme Court consider the gravity of the specific offense committed — the actual penalty imposed rather than the maximum penalty available — and not the penalty in the abstract.[17] According to Appellee, the trial court did not consider that Appellee's son paid no fine and was subject only to house arrest as a result of his plea deal, and Appellee urges that we affirm the Commonwealth Court's remand for such examination.

Appellee further offers that the Commonwealth Court properly remanded for the trial court's consideration of whether Appellee's son had engaged in a pattern of misbehavior. As noted above, the trial court's review of the time period during which

---

[17] It appears that the trial court, in considering the maximum penalty available, considered what crimes Graham could have been convicted of — specifically, use of communication facility — which would have added additional potential fines, even though he was not convicted of this crime.

Graham had used Appellee's home to sell illegal drugs was based upon evidence that the Commonwealth agrees should not have been considered as the investigation was tainted by Officer Walker's involvement. *See supra* note 6. According to Appellee, at best, the trial court could have inferred a two-month period of sales. Appellee stresses that her vehicle was used as part of drug sales on only two occasions.

Related thereto, Appellee argues that the trial court improperly relied solely on an unspecified harm to society when conducting its analysis, and that our Court in *5444 Spruce Street* specifically rejected such a consideration. 832 A.2d at 402. Appellee takes issue with the Commonwealth's position that general costs and risks associated with police investigations are permissible factors, as, according to Appellee, they are akin to the "general harm to society" considerations this Court has held to be insufficient to uphold a civil forfeiture. Appellee's Brief at 50. Further, according to Appellee, consideration of these generic harms ignores the unrebutted testimony that Appellee's neighbors were unaware of Appellee's son's sale of illegal drugs and that the only documented drug sales were to confidential informants. Finally, Appellee asserts that, while consideration of controlled buys, and the harm therefrom, could constitute actual harm, the trial court here undertook no such analysis.[18]

### 4. Forfeiture Analysis

We begin our analysis by recognizing the important nature of the matter before us, as it implicates protection of both the rights of the individual and his or her property

---

[18] *Amici*, Pennsylvania Association of Criminal Defense Lawyers, The Philadelphia Bar Association, The Hispanic Bar Association of Pennsylvania, the Barristers' Association of Philadelphia, The Institute for Justice, American Civil Liberties Union of Pennsylvania, Community Legal Services, Philadelphia NAACP, Philadelphia Legal Assistance, Philadelphia Volunteers for the Indigent, and SeniorLaw Center, also filed briefs in support of Appellee.

interests: "Individual freedom finds tangible expression in property rights. At stake in this and many other forfeiture cases are the security and privacy of the home and those who take shelter within it." *United States v. James Daniel Good Real Property*, 510 U.S. 43, 61 (1993). Indeed, in our society, a home and a vehicle are often essential to one's life and livelihood. This is why "[f]orfeitures are not favored; they should be enforced only when within both [the] letter and spirit of the law." *United States v. One 1936 Model Ford V-8 De Luxe Coach*, 307 U.S. 219, 226 (1939). Yet, forfeiture serves laudable goals, including the removal of illegal items from circulation in society, as well as dislodging the property used to facilitate illegal enterprises from the hands of criminals. The forfeiture of property can serve as an important aid in the fight communities wage against crime and encourages property owners to prevent their property from being used for criminal activities. Finally, forfeiture assists in funding the costs of law enforcement.[19] Thus, a tension exists between the undeniable goals of protecting our citizens' property rights and freedoms, and deterring and terminating criminal enterprises. As noted by courts and in academia, there is a large degree of

---

[19] Indeed, in Pennsylvania, 100% of forfeiture proceeds go to law enforcement agencies. 42 Pa.C.S. § 6801(e)-(h). As a result, some have suggested there is a financial incentive to maximize the seizure of forfeitable property. *1997 Chevrolet*, 106 A.3d at 877 (Pellegrini, J., concurring); *Leonard v. Texas*, 2017 U.S. LEXIS 1573, *3-4 (U.S. 2017) (Thomas, J., statement respecting the denial of certiorari) ("Partially as a result of this distinct legal regime, civil forfeiture has in recent decades become widespread and highly profitable. And because the law enforcement entity responsible for seizing the property often keeps it, these entities have strong incentives to pursue forfeiture." (citations omitted)); *Bennis v. Michigan*, 516 U.S. 442, 456 (1996) (Thomas, J., concurring) (offering that "[f]orfeiture could become more like a roulette wheel employed to raise revenue from innocent but hapless owners . . . or a tool wielded to punish those who associate with criminals, than a component of a system of justice"); *See generally* Office of Inspector Gen., U.S. Dept. of Justice, *Review of the Department's Oversight of Cash Seizure and Forfeiture Activities* (March 2017).

uncertainty regarding current excessive fines jurisprudence.[20]  We endeavor to provide some clarity and uniformity to this area of the law.

### a. Instrumentality

Our first area of inquiry concerns the nexus — the relevance and import — of the property to the offense.  Specifically, we examine whether the Commonwealth Court properly construed the Excessive Fines Clause to require, as a threshold matter, the property at issue to be an instrumentality of the underlying offense.  As noted above, the Commonwealth Court determined that, independent of proportionality, to "survive an Eighth Amendment Challenge, the Commonwealth must show, initially, that the forfeitable property was the instrumentality of the offense."  *1997 Chevrolet*, 106 A.3d at 854.  According to the Commonwealth Court, only once an instrumentality relationship is demonstrated does the examination turn to whether the amount of the forfeiture is grossly disproportionate to the gravity of the offense.  *Id.*  at 854, 859.

We begin our analysis of the instrumentality question with a review of the historical underpinnings of the distinctions between *in rem* and *in personam* forfeitures, then consider relevant case law from both the United States Supreme Court and our Court.  *In personam* forfeitures result from criminal conviction, and proceed directly against an individual.  Such forfeitures "have historically been treated as punitive, being part of the punishment imposed for felonies and treason in the Middle Ages and at

---

[20] *See, e.g.*, Beth A. Colgan *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 295 & n.92 (2014) (describing lower courts' treatment of Excessive Fines Clause after *Bajakajian* as "disorder" and "a quagmire") (hereinafter "Colgan").

common law." *Bajakajian*, 524 U.S. at 332. Statutes that authorize *in personam* forfeiture make the forfeiture part of a defendant's sentence, like the statute at issue in *Bajakajian*, which directed a court, in imposing its sentence, to order the forfeiture of property "involved in" the offense. 18 U.S.C. § 982(a)(1). As the *Bajakajian* Court explained, "[t]he forfeiture is thus imposed at the culmination of a criminal proceeding and requires conviction of an underlying felony, and it cannot be imposed upon an innocent owner . . . but only upon a person who has himself been convicted." 524 U.S. at 328.

*In rem* forfeitures are qualitatively different from *in personam* forfeitures. *In rem* forfeitures proceed against the property itself, are deemed to be civil in nature, are not dependent upon a criminal prosecution, and traditionally, at least prior to *Austin*, serve primarily or ostensibly remedial, rather than punitive, ends, regardless of the impact upon the property owner. *See Origet v. United States*, 125 U.S. 240, 246 (1888) ("[T]he merchandise is to be forfeited irrespective of any criminal prosecution. . . . The person punished for the offence may be an entirely different person from the owner of the merchandise, or any person interested in it."); *Taylor v. United States*, 44 U.S. 197, 210 (1845) ("In one sense, every law imposing a penalty or forfeiture may be deemed a penal law; in another sense, such laws are often deemed, and truly deserve to be called, remedial."). The theory behind such forfeitures "was the fiction that the action was directed against 'guilty property,' rather than against the offender himself." *Bajakajian*, 524 U.S. at 330. Thus, the "guilty property" concept which serves to permit the taking by the state of property, even that of a non-offender, is the cornerstone of *in rem* forfeiture.

The origins of civil *in rem* forfeiture may be traced to Judeo-Christian teachings, which conceived of property itself as committing a wrong. *See* Andrew Crawford, *Civil*

*Asset Forfeiture in Massachusetts: A Flawed Incentive Structure and its Impact on Indigent Property Owners*, 35 B.C. J.L. & Soc. Just. 257, 260-61 n.32 (2015) (citing Exodus 21:28 (English Standard Version) ("When an ox gores a man or a woman to death, the ox shall be stoned, and its flesh shall not be eaten, but the owner of the ox shall not be liable.")).

By the 11th Century, the English Common Law, as later noted by Sir Edward Coke and Sir William Blackstone, embraced the notion of property committing a wrong through the concept of the "deodands." *Id.* at 261; Brent Skorup, *Ensuring the Eighth Amendment Protection From Excessive Fines in Civil Asset Forfeiture Cases*, 22 Geo. Mason U. C.R. L.J. 427, 432-33 (2012) (hereinafter "Skorup"). A jury determined that property was a deodand if it directly caused the death of a person and, if so, it was forfeited to the crown. *Id.* at 432; *see generally* Barclay Thomas Johnson, *Restoring Civility - the Civil Asset Forfeiture Reform Act of 2000: Baby Steps Towards a More Civilized Civil Forfeiture System*, 35 Ind. L. Rev. 1045, 1047-48 (2001/2002). Deodands, as well as forfeiture upon conviction of felony or treason, and statutory forfeiture, served as the three primary kinds of forfeiture established in England at the time the Eighth Amendment was ratified. While the concept of deodands laid the foundation for modern forfeiture law, it did not become part of the common law tradition in America. *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 682 (1974). Rather, common law courts exercised civil *in rem* jurisdiction purely through forfeiture statutes. *Id.* at 683.

The earliest civil *in rem* forfeiture statutes in the United States, allowing the federal government to seize property in the colonies, were patterned after English law. Upon independence, civil *in rem* forfeiture statutes largely focused on admiralty matters — customs offenses, piracy, and slave trafficking — resulting in the forfeiture of ship

and cargo. Even early on, these forfeitures were viewed as serving, at least in part, punitive purposes. Indeed, consistent with its ancient origins, civil *in rem* forfeiture proceeded under the legal fiction that the property used in furtherance of some criminal activity is, itself, "guilty" of the crime, as evinced by Justice Joseph Story's explanation in the United States Supreme Court's seminal decision in *The Palmyra*, 25 U.S. 1, 14-15 (1827) ("The thing is here primarily considered as the offender . . . . But the practice has been, and so this Court understand the law to be, that the proceeding *in rem* stands independent of, and wholly unaffected by any criminal proceeding in personam."). Thus, because it was the "guilty" property itself that was the sole focus of the malfeasance, historically, *in rem* forfeitures were limited to instrumentalities of the underlying offenses, as the property was "subject to forfeiture because it was the actual means by which an offense was committed." *Bajakajian*, 524 U.S. at 333 n.8; *see also Austin*, 509 U.S. at 628 (Scalia, J., concurring in part and concurring in the judgment) ("[I]n the case of deodands, juries were careful to confiscate only the instrument of death and not more. Thus, if a man was killed by a moving cart, the cart and its horses were deodands, but if the man died when he fell from a wheel of an immobile cart, only the wheel was treated as a deodand, since only the wheel could be regarded as the cause of death."). *See generally* Nelson at 2457-75.[21]

---

[21] As noted above, generally speaking, America's importation of forfeiture law from England did not include the common law notion of the deodands, but, rather, our courts exercised *in rem* jurisdiction through forfeiture statutes. Section 6801 of Pennsylvania's current civil *in rem* forfeiture statute states in pertinent part:

> (a) Forfeitures generally. The following shall be subject to forfeiture to the Commonwealth and no property right shall exist in them:

> (6)(i) All of the following:

> * * *

(continued…)

Indeed, this historical concentration on the tainted property itself has a long legacy, spanning the centuries and becoming an integral part of the appropriate excessiveness standard. As Justice Oliver Wendell Holmes opined, "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). His adage is particularly apropos here, as the focus on the relationship between the property and the underlying offense has deep roots in both English and American law.

While, in <u>Austin</u>, Justice Scalia's strict focus on the relationship of the property to the crime did not carry the day as discussed above, it certainly informs our analysis of the instrumentality question. Justice Scalia stressed that, in his view, the Constitution has not required negligence, or any other degree of culpability, to support a forfeiture, and to impose such a culpability requirement would erase the difference between

---

(…continued)

> (C) Real property used or intended to be used to facilitate any violation of the Controlled Substance, Drug, Device and Cosmetic Act, including structures or other improvements thereon, . . . which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of The Controlled Substance, Drug, Device and Cosmetic Act.

42 Pa.C.S. § 6801(a)(6)(i)(C).

Whether there exists a common law basis for forfeiture in Pennsylvania has not been definitively decided by our Court, and lower court pronouncements have been inconsistent. *Compare Commonwealth v. One 2001 Toyota Camry*, 894 A.2d 207 (Pa. Cmwlth. 2006) (finding common law forfeiture exists in Pennsylvania) *with Commonwealth v. Crosby*, 568 A.2d 233 (Pa. Super. 1990) (criticizing notion of common law forfeiture, but bound to follow prior Superior Court precedent). While we make no pronouncement on this issue in this appeal, recent case law from the Commonwealth Court has embraced the historical limitation on the source of civil *in rem* forfeiture, holding common law forfeiture does not exist in Pennsylvania, and, thus, that the Commonwealth has no legal basis, absent statutory authority, for civil seizure. *Commonwealth v. Irland*, 153 A.3d 469 (Pa. Cmwlth. 2017).

traditional *in rem* forfeiture and traditional *in personam* forfeiture. *Austin*, 509 U.S. at 625-26 (Scalia, J., concurring in part and concurring in the judgment). He concluded that an *in rem* forfeiture goes beyond the traditional limits that the Eighth Amendment permits only if the property cannot be regarded as an instrumentality of the offense, offering the example of a building from which an isolated illegal drug sale occurs. According to Justice Scalia, the forfeiture of such property would constitute an excessive fine, as the relevant inquiry revolved around not the value of the confiscated property, but, rather, whether the confiscated property had a close relationship to the offense: "[T]he relevant inquiry for an excessive forfeiture under [21 U.S.C. § 881(a)(4)(C)] is the relationship of the property to the offense: Was it close enough to render the property, under traditional standards, 'guilty' and hence forfeitable?" *Id.* at 627-28. To make the point concrete, Justice Scalia's offered a "gold scales" hypothetical to illustrate his "close enough relationship" test, opining that scales used to measure illegal drugs were forfeitable, "whether made of the purest gold or the basest metal." *Id.*

Subsequently, in *Bajakajian*, while considering the Excessive Fines Clause in the context of a criminal *in personam* forfeiture, the Supreme Court suggested that it was not erasing the distinctions between civil *in rem* and criminal *in personam* forfeitures, or removing instrumentality as an element of *in rem* forfeiture, as the Court referred to the class of *in rem* forfeitures of "guilty property" as "instrumentality forfeitures." After a somewhat lengthy discussion of the history of civil *in rem* forfeiture, the *Bajakajian* Court rejected instrumentality only as a requirement of criminal *in personam* forfeitures. Indeed, the Court found that, because the forfeiture before it was not *in rem*, it was "irrelevant whether respondent's currency is an instrumentality." 524 U.S. at 333. Thus, rather than embracing a proportionality inquiry for all excessiveness challenges, the

*Bajakajian* Court seemingly preserved the critical distinctions between criminal *in personam* and civil *in rem* forfeitures.

The Supreme Court continued to distinguish between tainted property —i.e, guilty property — and untainted property in the context of the Sixth Amendment. In *Luis v. United States*, 136 S.C.t 1083 (2016), a criminal defendant accused of violating federal health care and banking laws challenged, under the Sixth Amendment, a court's pre-trial freezing of his assets. The high Court held such pre-trial deprivation violated the Sixth Amendment, noting, "[t]he relevant difference consists of the fact that the property here is untainted; *i.e.*, it belongs to the defendant pure and simple. In this respect it differs from a robber's loot, a drug seller's cocaine, a burglar's tools, or other property associated with the planning, implementing, or concealing of a crime." *Id.* at 1090. Indeed, the *Luis* Court offered that it "found no decision of this Court authorizing unfettered, pretrial forfeiture of the defendant's own 'innocent' property -- property with no connection to the charged crime." *Id.* at 1094. Similarly, in a concurring opinion, Justice Thomas, the author of *Bajakajian*, offered that the common law permitted the government to seize tainted assets before trial, but "such forfeitures were traditionally 'fixed . . . by determining what property has been 'tainted' by unlawful use.'. . . So the civil *in rem* forfeiture tradition tracks the tainted-untainted line. It provides no support for the asset freeze here." *Id.* at 1100.

Even more recently, Justice Thomas authored a statement to the high Court's denial of *certiorari* in an appeal involving a challenge to a civil forfeiture statute as violative of due process, and therein further illuminating the continued focus on the nexus between the property sought to be forfeited and the underlying offense. *See Leonard v. Texas*, 2017 U.S. LEXIS 1573 (U.S. 2017) (Thomas, J., statement respecting the denial of certiorari). In his statement, Justice Thomas again emphasized

the distinction between *in personam* proceedings and *in rem* proceedings, stressing that the United States Supreme Court "has justified its unique constitutional treatment of civil forfeiture largely by reference to a discrete historical practice that existed at the time of the founding," providing for statutory forfeitures of property "under the fiction that the thing itself, rather than the owner, was guilty of the crime." *Id.* at *5-6. Moreover, Justice Thomas offered that, in the absence of this historical approach to forfeiture, "the Constitution presumably would require the Court to align its distinct doctrine governing civil forfeiture with its doctrines governing other forms of punitive state action and property deprivation." *Id.* at *6 (citation omitted). Indeed, Justice Thomas was clearly skeptical whether even this historical approach was capable of sustaining modern civil forfeiture practice, noting that early forfeiture laws were narrower than modern statutes, and highlighting the limited nature of the type of property covered: "only the instrumentalities of the crime (such as the vessel used to transport the goods), not the derivative proceeds of the crime (such as property purchased with money from the sale of the illegal goods)" were forfeitable. *Id.* at *7-8.

Based upon the rich history of *in rem* forfeiture both in England and our country, and the clear demarcation between criminal *in personam* proceedings and those brought civilly *in rem*, as well as more recent pronouncements by the United States Supreme Court, it is evident to us that the "guilty property" fiction which serves as the basis for civil *in rem* forfeiture logically demands that the property sought to be forfeited be an instrumentality of the offense.[22]

---

[22] We recognize that, in *Austin*, the Court indicated that the property at issue was not an "instrument" of the underlying crime, but nevertheless remanded the matter for consideration of constitutional excessiveness. As emphasized by the Commonwealth, this contemplation of other factors suggests that the question of whether property subject to civil *in rem* forfeiture is an instrumentality is not dispositive of the excessiveness inquiry. We disagree. First, the *Austin* Court expressed no opinion on
(continued…)

Our Court's prior decisions support this view. In considering what factors were appropriate under an excessive fines analysis, our Court indicated, pre-*Bajakajian*, that the inquiry does not concern the value of the property forfeited, but, rather, the nexus between the offense and the subject property, in essence, adopting Justice Scalia's approach in *Austin*. We stated: "if the forfeited property was significantly used in the commission of the offense, the item may be forfeited regardless of its value." *In re King Properties*, 635 A.2d at 133. We further opined, "[w]here the evidence is that the criminal incident on which the forfeiture is based is not part of a pattern of similar incidents, there is no 'significant' relationship between the property sought to be forfeited and the offense." *Id.*; *see also Commonwealth v. Wingait Farms*, 690 A.2d 222, 227 (Pa. 1997).

Ten years later, and post-*Bajakajian*, in *5444 Spruce Street*, our Court re-evaluated the applicable excessiveness standard, and offered that we had not addressed the issue of whether the gross disproportionality test adopted in *Bajakajian* applied to *in rem* forfeitures "where the government has established a significant relationship between the property sought to be forfeited and the underlying criminal offense," 832 A.2d at 430, firmly indicating that a significant relationship between the property and the crime was a necessary prerequisite to a constitutional forfeiture. Even

---

(…continued)
the constitutional requisites of civil *in rem* forfeiture, expressly limiting its decision to its conclusion that *in rem* forfeitures could be subject to an Excessive Fines Clause challenge. Moreover, in offering that the property at issue was not an instrumentality, it did so in rejecting the government's argument that statutes which authorized forfeiture of "instruments" of the drug trade were "remedial," rather than punitive, such that the Excessive Fines Clause should not apply. Thus, the Court was not relying upon the understanding of "instrumentality" as that term would develop in subsequent cases, but was deeming the property at issue — a mobile home and auto body shop — not to be "contraband," and, thus, subject to an Eighth Amendment challenge.

further, we traced the high Court's pre-*Bajakajian* decisions, discerning a pointed distinction between forfeitures which were upheld because they exhibited a significant relationship between the property and the crime, and those where the property forfeited was not significantly related to the criminal activity, and in which the forfeiture was not upheld. *5444 Spruce Street*, 832 A.2d at 429-30.[23] Thus, while our Court did not expressly require a nexus between the property and the underlying offense, through its inventory of prior case law drawing a distinction based upon nexus, we strongly implied that only those properties with a significant relationship to the offense — instrumentalities — were forfeitable, and that this was a necessary precursor to any gross disproportionality test. Ultimately, as noted above, while our Court did not embrace express factors to be considered in an excessiveness analysis, nevertheless, we held that *Bajakajian*'s gross disproportionality test applied to all punitive forfeitures regardless of the form of the underlying proceedings, and overruled *In re King Properties*, but only to the extent it held otherwise.

Further, while the United States Supreme Court in *Austin* expressly limited its holding to a determination that civil *in rem* forfeitures can be subject to the protections of the Excessive Fines Clause, with respect to the nuts and bolts of the excessiveness inquiry, however, the Court majority plainly left open the idea that such an inquiry in the

---

[23] Rather than purely a constitutional threshold, we note that the "significant relationship" requirement is also a vestige of our Court's interpretation of the Forfeiture Act's requirement that the property be used or intended to be used to "facilitate" any violation of the Controlled Substance Act. 42 Pa.C.S. § 6801(a)(6). *Commonwealth v. 502-504 Gordon Street*, 607 A.2d 839, 842 (Pa. Cmwlth. 1992) ("In interpreting the term "facilitate," Pennsylvania courts require that the Commonwealth show a sufficient or substantial nexus between the property and the prohibited activity 'to mitigate the potentially harsh results of permitting the Commonwealth to penalize a citizen by a civil action against his property rather than a criminal action against his person.'" (citations omitted)). Thus, the required nexus between the property and the underlying crime has both a constitutional dimension, as well as a statutory one under the Forfeiture Act.

civil context should consider the nexus between the property and the underlying offense. *Austin*, 509 U.S. at 623 n.15 ("We do not rule out the possibility that the connection between the property and the offense may be relevant, but our decision today in no way limits the Court of Appeals from considering other factors in determining whether the forfeiture of Austin's property was excessive"). We find this lack of limitation on courts "from considering other factors" suggests that the question of whether property subject to civil *in rem* forfeiture is an instrumentality could be the foundation upon which other factors regarding excessiveness would be considered. While the United States Supreme Court has not directly addressed *in rem* forfeiture since *Austin*, post-*Austin* statements by the high Court surely perpetuate the history, and essential nature, of this distinction between tainted and untainted property. *Luis*; *Bajakajian*.

The instrumentality requirement necessitates the establishment of a "significant relationship" between the offense and the property sought to be forfeited — the property was "significantly used in the commission of the offense." *King Properties*, 635 A.2d at 133.[24] This significant relationship is what "taints" the property and renders it "guilty," such that it becomes subject to in rem forfeiture. Without an instrumentality requirement, the distinction between civil *in rem* forfeiture and criminal *in personam* forfeiture would be vitiated, something neither the United States Supreme Court nor our Court has embraced. In *5444 Spruce Street*, we did not reject a threshold instrumentality determination when we adopted the *Bajakajian* grossly disproportional test. Instead, as the initial part of our analysis, we surveyed our prior case law, noting

---

[24] *Accord Commonwealth v. 5043 Anderson Rd., Buckingham Township, Bucks County*, 728 A.2d 907 (Pa. 1999); *Wingait Farms*; *Commonwealth v. 4029 Beale Avenue, Altoona, Blair County*, 680 A.2d 1128 (Pa. 1996).

those decisions in which the forfeiture had been upheld were also those where there was a nexus between the property and the offense. Finally, while, in *5444 Spruce Street*, we overruled our prior decision in *In re King Properties*, we did so only to the extent that decision differed with the gross disproportionality test.

As established above, all forfeitures, whether criminal *in personam* or civil *in rem*, are predicated upon the commission of a criminal offense. In an *in personam* forfeiture, that offense is established by a criminal conviction demonstrating the guilt of an individual that may be punished by property forfeiture as a term of the sentence. In an *in rem* forfeiture, however, the "guilt" of the property must be established by proof of its illicit use. Thus, as one commentator has observed, "[t]his distinction makes sense because, if a court considers only proportionality, an in rem civil forfeiture becomes equivalent to in personam punishment by disregarding the res—which is a legal incongruity because civil forfeiture does not require a guilty owner of the res, only a guilty res." Skorup at 448-49. Instrumentality is not a necessary element of *in personam* forfeitures because such forfeitures do not depend upon the "guilty property" fiction, but rather, upon the guilt of the individual.

Based upon the ancestry of civil *in rem* forfeiture, the teachings of United States Supreme Court and our precedent, we find that the concept of guilty or tainted property has been a long-standing and consistent theme with respect to civil *in rem* forfeiture, and remains vital today. Indeed, if nexus were merely a factor to be considered in determining whether the forfeiture was excessive, the "guilty property" fiction that has served as the cornerstone of *in rem* forfeiture for hundreds of years would be nullified.

Therefore, we hold that an instrumentality analysis, which considers the relationship between the property to be forfeited and the underlying criminal activity, must be a threshold inquiry in addressing an excessiveness challenge to a civil *in rem*

forfeiture. Accordingly, we affirm the Commonwealth Court's conclusion that the Eighth Amendment requires a property subject to civil *in rem* forfeiture be an instrumentality of the underlying offense.[25]

Having determined that, when faced with an Excessive Fines Clause challenge to a civil *in rem* forfeiture, courts must engage in a threshold instrumentality analysis, we set forth factors to be considered in making that determination. To be an instrumentality, the property itself is required to be "significantly utilized in the commission" of the offense. *Wingait Farms*, 690 A.2d at 227. Indeed, there may be property that is connected to a crime, but is not significantly used in the crime. Considerations regarding this "significant utilization" assessment include: whether the property was integral to the commission of the offense — i.e., uniquely important to the success of the illegal activity; whether the use of the property was deliberate and planned or was merely incidental and fortuitous to the illegal enterprise; whether the illegal use of the property was an isolated event, or repeated; whether the purpose of acquiring, maintaining or using the property was to carry out the offense; and whether

---

[25] The Commonwealth revisits the idea of instrumentality being purely remedial, and, thus, not subject to an Eighth Amendment inquiry. In <u>Austin</u>, as noted above, while recognizing that the forfeiture of "contraband" could be characterized as remedial — as such forfeiture removed dangerous or illegal items from society, and, thus, was not subject to Eighth Amendment scrutiny — the Court rejected the assertion that conveyances used to transport illegal liquor were such contraband; accordingly, the Court found that the forfeiture of such property did not escape review under the Excessive Fines Clause. Thus, under the Supreme Court's case law, forfeiture of both instrumentalities and non-instrumentalities may be punitive and subject to Excessive Fines Clause analysis. *See Bajakajian*, 524 U.S. at 331 n.6. On that basis, we readily reject the Commonwealth's assertion that a civil *in rem* forfeiture is *ipso facto* constitutionally permitted where the property is an instrumentality of the criminal offense. *See Bajakajian*; *Austin*; *In re King Properties; see also United States v. Ferro*, 681 F.3d 1105, 1113-14 (9th Cir. 2012) (finding, in light of *Austin*, modern forfeiture statutes served to punish the owner at least in part, and, thus, with the exception of the forfeiture of contraband, instrumentalities are protected by the Eighth Amendment).

the illegal use of the property was extensive spatially and/or temporally. *See United States v. Milbrand*, 58 F.3d 841, 846, 848 (2d. Cir. 1995).

Finally, consistent with the historical notion of the deonands, we caution that property is divisible.[26] Where a significant relationship to an offense is established with regard to only a portion of property which is "practicably divisible" from the rest, only the offending portion of the property may be forfeited; but if the property is not divisible, the entire property is forfeited. *5043 Anderson Rd.*, 728 A.2d at 909. Thus, in making the instrumentality assessment, a court must closely examine not only the nexus between the property and the offense, but the specific aspect of the property at issue.

In sum, an analysis of whether a civil *in rem* forfeiture violates the Eighth Amendment requires a threshold inquiry into whether the specific property sought to be forfeited is an instrumentality of the underlying offense. If the property sought to be forfeited is an instrumentality of the underlying offense, the inquiry continues to an examination of proportionality. If not, the forfeiture cannot withstand Eighth Amendment scrutiny and the inquiry ends. Having addressed this threshold inquiry, we turn to the question of proportionality.[27]

---

[26] *See United States v. Chandler*, 36 F.3d 358, 364 (4th Cir. 1994).

[27] Most courts have not limited the excessiveness determination to only the instrumentality inquiry, but have utilized both an instrumentality and proportionality test. *See*, *e.g.*, *Utah v. Real Property at 633 East 640 North, Orem*, 994 P.2d 1254, 1257 (Utah 2000) ("We similarly hold that the threshold test in real property forfeitures is whether the defendant property is an instrumentality of the offense. If instrumentality is proven, we must then examine whether the ordered forfeiture is "grossly disproportionate" to the offense."); *United States v. 6380 Little Canyon Rd., El Dorado, Cal.*, 59 F.3d 974, 983 (9th Cir. 1995) ("Although any forfeiture must meet the instrumentality test, its potentially harsh results, when applied alone, make us hesitate to accept it as the sole test for applying the command of *Austin*. We accept the proportionality test as a check on the instrumentality approach.").

### b. Proportionality

We begin with the premise that "[t]he touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality." *Bajakajian*, 524 U.S. at 334. Although, as noted above, *Bajakajian* involved a criminal *in personam* forfeiture, the Court did not limit its gross disproportionality test to such proceedings, and our Court, in *5444 Spruce Street*, expressly applied that standard to all punitive forfeiture proceedings, including civil *in rem* forfeitures. *5444 Spruce Street*, 832 A.2d at 403.

Broadly speaking, when engaging in a proportionality review, a court compares the amount of the forfeiture to the gravity of the offense. If the amount of the forfeiture is grossly disproportional to the gravity of the offense, it is unconstitutional. *Bajakajian*, 524 U.S. at 336-37. While the overarching standard to be applied is not in dispute, the specifics of this comparison have yet to be expressed by either the federal high Court or our Court.

Specifically, based upon the background and arguments offered by the parties and *amici*, it is clear that there are no established guidelines to be employed for a proportionality analysis. The United States Supreme Court in <u>Austin</u> left it to the lower federal tribunals to flush out the relevant factors for determining whether a forfeiture was excessive, and, in *Bajakajian*, the Court noted that the analysis was inherently subjective and imprecise. Even the factors offered in *Bajakajian* were not prescribed as a rigid test. Moreover, our Court has observed that other courts have considered factors beyond the monetary value of the property seized in determining whether the forfeiture was an excessive fine; yet, we did not determine what approach was preferable, but left it to the "sharpening and annealing process of litigation in the lower courts." *5444 Spruce Street*, 832 A.2d at 402 n.7. Indeed, since *Bajakajian* was

decided in 1998, various courts have promoted flexibility, identifying various potential considerations in making the gross disproportionality inquiry. *See*, *e.g.*, *United States v. Viloski*, 814 F.3d 104, 110 (2nd Cir. 2016) ("Our unwillingness in past cases to describe the *Bajakajian* factors as exhaustive reflects *Bajakajian* itself, which never prescribed those factors as a rigid test."); *Collins v. SEC*, 736 F.3d 512, 527 (D.C. Cir 2013) ("[T]he four factors derived from *Bajakajian* hardly establish a discrete analytic process."); *United States v. $100,348 in Currency*, 354 F.3d 1110, 1121 (9th Cir. 2004) (offering that, in assessing whether a fine is excessive, courts are "not required to consider 'any rigid set of factors'"). Thus, we must determine what factors define the contours of the gross proportionality examination in civil *in rem* proceedings in Pennsylvania.

The Commonwealth urges the application of a constricted standard based upon its reading of *Bajakajian*, with emphasis on comparing the assessed value of the property against the maximum statutory penalty. Yet, this approach has not been the teaching of the United States Supreme Court or our Court; while the excessiveness analysis looks to the proportionality between the forfeited property and the gravity of the underlying offense, it is accomplished through a more nuanced inquiry.

Indeed, initially, we observe that, in civil *in rem* forfeitures, the owner of the property and the offender may not be the same. The potential harshness of a forfeiture against a property owner with no alleged criminal conduct, or minor culpability, however, must be recognized in any excessiveness inquiry, and we find doing so comfortably fits within the United States Supreme Court's gross disproportionality test. Therefore, we must be wary of forfeiture imposing greater punishment than appropriate for the underlying crime itself. Indeed, a civil *in rem* proceeding can be viewed in one way as a "super criminal" proceeding, in which a property owner is punished through the seizure of his or her property, but without all the safeguards associated with criminal

proceedings. While Fourth and Fifth Amendment protections are applicable to civil forfeiture proceedings, *One 1958 Plymouth Sedan*, 380 U.S. at 702 (Fourth Amendment); *United States v. United States Coin & Currency*, 401 U.S. 715, 721 (1971) (Fifth Amendment), there is no right to counsel for individuals subjected to forfeiture proceedings. Further, while not presently challenged, we note that the burden of proof on the Commonwealth for civil forfeiture, including of one's home, is merely the preponderance of the evidence standard. Finally, and critically, while we discuss the procedures under the Forfeiture Act more fully below, we observe that there is no presumption of innocence, but rather, a presumption of culpability once the Commonwealth has established a nexus between the property and the crime, and certainly no presumption of innocence with regard to the innocent owner defense. For these reasons, we conclude it is appropriate to consider the harshness of the forfeiture on the individual property owner as a part of the excessiveness analysis, which may be manifested in an assessment of both the value of the property and the gravity of the underlying offense factors. Thus, we first turn to address the appraisal of the property sought to be forfeited.

Regarding proper valuation of the property, in *Bajakajian*, the property sought to be forfeited was the currency that Bajakajian failed to report. Thus, the Court understandably spoke in terms of the "amount" of the forfeiture, *Bajakajian* 524 U.S. at 336-37, ultimately comparing the gravity of the offense with "the $357,144 forfeiture" sought by the government. *Id.* at 339. While our Court in *5444 Spruce Street* was faced with the forfeiture of a house, and spoke of the need to determine the "value" of the property, 832 A.2d at 403, we did not expand upon what went into such assessment.

In our view, in the realm of civil *in rem* forfeiture, both an objective pecuniary and subjective non-pecuniary valuation of the property is necessary. While a simple market value may be appropriate in some instances, as noted above, certain property — such as a residence, a vehicle, or other similar necessities in our daily life — carry additional value to the owner and possibly others, and, thus, call for a subjective non-pecuniary evaluation of the property sought to be forfeited. Such a valuation would consider whether the property is a family residence, or is essential to the owner. *See, e.g., United States v. 45 Claremont Street*, 395 F.3d 1, 6 (1st Cir. 2004) (noting harshness of forfeiture on property owner due to living in residence with four young children and rental of upper-floor apartments for supplemental income, but outweighed by owners direct involvement in drug transactions).

Related thereto, we believe it proper to consider the financial or other consequences of forfeiture upon the property owner, and any innocent third parties. *See, e.g., United States v. 6380 Little Canyon Road, El Dorado California*, 59 F.3d 974 (9th Cir. 1995) (considering fair market value, subjective value including whether family residence, and hardship to the property owner, including effect of forfeiture on owner's family or financial condition); *Real Property at 633 East 640 North, Orem*, 994 P.2d at 1258-60 (adopting Ninth Circuit consideration of hardship to property owner); *People v. One 2000 GMC YG169852*, 829 N.E.2d 437, 442 (Ill. App. 2005) (considering the impact of the forfeiture on the claimant in light of the claimant's circumstances, noting that the claimant was "a person of limited means and assets").

Finally, we address one additional aspect of the value of the property inquiry: whether the forfeiture would deprive the property owner of his or her livelihood. Specifically, as noted above, the Eighth Amendment Excessive Fines Clause arose from the English constitutional tradition including Magna Carta. *See United States v.*

*Viloski*, 814 F.3d 104, 111 (2nd Cir. 2016). The Great Charter which serves as the cornerstone of our own constitutional jurisprudence, required that a fine "should not deprive a wrongdoer of his livelihood." *Bajakajian*, 524 U.S. at 335 (citing Magna Carta);[28] *see also Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 269 & 271 (1989) (noting Magna Carta's mandate that an "amercement" — payment to the Crown as a penalty for an offense — "not be so large as to deprive [the wrongdoer] of his livelihood.").[29] These English roots, and the concomitant hostility to such onerous fines that would deprive one of his or her means of living, became "deeply rooted" in Anglo-American constitutional thought and played a significant role in shaping the Eighth Amendment. *United States v. Levesque*, 546 F.3d 78, 84 (1st Cir. 2008); *see also* Colgan at 330-35 (concluding "the idea of saving defendants from persistent impoverishment was a guiding principle reaching back to the days of the Magna Carta and the English Bill of Rights, and enduring through the ratification of the Eighth Amendment."); Nicholas M. McLean*, Livelihood, Ability to Pay, and the Original Meaning of the Excessive Fines Clause*, 40 Hastings Const. L. Q. 833, 896-900 (2013) (offering that consideration of personal circumstances — including the ability to maintain some minimal level of economic subsistence, protection of the homestead, and impact of a forfeiture on an individual's children — when undertaking an Excessive Fines Clause inquiry is grounded in Magna Carta, consistent with *Bajakajian*, and should be a core Eighth Amendment norm).

---

[28] The Supreme Court did not answer whether this was an appropriate inquiry in *Bajakajian*, because it found Bajakajian did not raise the question and the district court made no factual findings on the issue. *Id.* at 340 n.15.

[29] *See also Commonwealth v. Carela-Tolentino*, 48 A.3d 1221, 1226 n.6 (Pa. 2012) (Castille, C.J., dissenting statement).

We find such consideration — whether the forfeiture would deprive the property owner of his or her livelihood, i.e., his current or "future ability to earn a living," *Levesque*, 546 F.3d at 85 — to be entirely appropriate and consistent with the teachings of *Bajakajian* and *5444 Spruce Street*. Thus, we find that both a pecuniary objective valuation as well as a non-pecuniary subjective valuation are necessary to assess in full measure the value of the property sought to be forfeited in an excessiveness analysis. This comprehensive value of the property must then be compared to the gravity of the offense.

Assessing the gravity of the offense has engendered wide discussion and approaches regarding the appropriate factors for making this determination. The United States Supreme Court in *Bajakajian*, while arising in the criminal *in personam* context, set forth certain considerations in its analysis. First, the Court considered the nature of the crime. The Court found that, because the offense underlying the forfeiture was merely a reporting offense, and that it was permissible to transport money out of the country after reporting, the gravity was relatively low. *Bajakajian*, 524 U.S. at 337. Additionally, the court considered the relation of the violation to any other illegal activity, finding that the money was used to repay a lawful debt, and that Bajakajian did not fit into the class of persons for whom the statute was designed, such as a money launderer, a drug trafficker, or a tax evader. *Id.* at 338. The Court also considered the maximum sentence and fine that could have been imposed on Bajakajian, concluding that such penalties were a fraction of the "penalties authorized," and confirmed a minimum level of culpability. *Id.* at 339 n.14. Finally, the high Court looked to the harm that was caused. The Court found that the failure to report the money affected only one party, the federal government, and in relatively minor fashion. *Id.* at 339.

Our Court in *5444 Spruce Street*, in adopting the *Bajakajian* gross disproportionality construct, characterized the high Court's approach as defendant-culpability focused, rather than centered on the severity of the crime in the abstract. *5444 Spruce Street*, 832 A.2d at 401. Our Court observed that the *Bajakajian* Court enumerated three factors to measure the gravity of the crime, but limited these to the conduct of the defendant: "the penalty imposed as compared to the maximum penalty available; whether the violation was isolated or part of a pattern of misbehavior; and, the harm resulting from the crime charged." *Id.* at 402. As noted above, however, our Court did not limit itself to these factors, or determine which factors were to be employed.

Thus, in our view, in analyzing the gravity of the offense, a court must consider these *Bajakajian* factors. In doing so, a court must consider the essence of the crime — that is, the nature of the underlying offense. Related thereto, the relation of the offense to any other illegal activity and whether the offender fit into the class of persons for whom the offense was designed should be considered. Further, the court should take into account the maximum penalty as compared to the penalty imposed upon the criminal offender. In making this assessment, the actual penalty imposed (sentence, fine) upon the offender giving rise to the forfeiture is compared to the maximum authorized sentence for the underlying offenses for which the offender was convicted. Moreover, the regularity of the criminal conduct must be considered, including whether the illegal acts were isolated or frequent, constituting a pattern of misbehavior. Finally, a court must take into account the harm resulting from the crime charged. Contrary to the Commonwealth's argument, we find generic considerations of harm to be largely unhelpful in this regard, as all crimes have a negative impact in some general way to society.

Additionally, various federal and state courts have augmented these core considerations with attention on the property owner's culpability. *See*, *e.g.*, *Ferro*, 681 F.3d at 1116; *von Hofe*, 492 F.3d at 188-89; *People v. 2010 Harley-Davidson*, 64 N.E.3d 716 (Ill. App. 2016), *appeal granted*, 2017 Ill. LEXIS 199 (Jan. 25, 2017). Thus, we turn to the propriety of consideration of the property owner's culpability.

As detailed above, the Commonwealth contends that, under the Excessive Fines Clause, a civil *in rem* forfeiture does not require criminal culpability, but rests upon the idea that the owner has been negligent in allowing his or her property to be misused, and is being punished for such negligence. In this view, where the property owner has done all that he or she can reasonably do to prevent the use of the property for criminal purposes, forfeiture is impermissible. Forfeiture thus serves as an incentive to responsibly manage one's property. Further, the Commonwealth offers that the owner's culpability is accounted for under the Forfeiture Act's innocent owner defense, which, as discussed more fully below, exempts from forfeiture property which the property owner did not know was being used illegally, or did not consent to being so used. 42 Pa.C.S. § 6802(j). According to the Commonwealth, it would be duplicative to make relative culpability a factor in a gross disproportionality test where it is a defense in a statutory *in rem* proceeding.

As noted, the Supreme Court's decision in *Bajakajian* arose from a criminal *in personam* forfeiture in which the property owner was charged with the underlying crime. Thus, the culpability of the property owner was established. Indeed, a criminal conviction is a prerequisite for an *in personam* forfeiture. *Bajakajian*, 524 U.S. at 328. By contrast, neither the commencement of criminal proceedings nor a conviction is required for a civil *in rem* forfeiture. Nevertheless, the Excessive Fines Clause is implicated because forfeiture is viewed, at least in part, as punishment. That is, the

government is seeking to punish the property owner for criminal conduct he or she allowed to transpire in or with the property. *Austin*, 509 U.S. at 622; *von Hofe*, 492 F.3d at 185. Therefore, we find the degree to which the property owner allowed the property to be employed in criminal activity — i.e., his or her culpability — to be a factor concerning whether the forfeiture of the owner's property is grossly disproportional.[30] In this regard, we conclude appropriate considerations are: whether the owner was negligent or reckless in allowing the illegal use of the property, and whether the owner was directly involved in the illegal activity and to what extent. *See Real Property at 633 East 640 North, Orem, Utah*, 994 P.2d at 1259.

As poignantly offered by Justice Anthony Kennedy in his concurring opinion in *Austin*, "[a]t some point, we may have to confront the constitutional question whether forfeiture is permitted when the owner has committed no wrong of any sort, intentional or negligent. That for me would raise a serious question." *Austin*, 509 U.S. at 629 (Kennedy, J., concurring); *see also id.* at 617. While a forfeiture may be especially troubling for a completely innocent property owner, contrary to the Commonwealth's assertions, the degree of culpability is significant even if the trial court determines that the property owner did not satisfy a statutory innocent owner defense. Constitutional protections are independent from statutory safeguards. Indeed, the legislature's desire to protect an innocent property owner is not necessarily co-extensive with the constitution's protection against excessive sanctions. As a constitutional matter, we find that assessing the gravity of the offense includes a determination of the degree of

---

[30] *See Ferro*, 681 F.3d at 1115 ("Where, as here, the person who committed the sole crime charged which gave rise to forfeitability is not the property's owner, the culpability of the owner must be considered in the analysis. We must remember that [the property owner] was not charged with any crime, much less a crime which in some way enabled or caused [the offender's] crime.").

knowledge of a property owner. Even a property owner, while not wholly without knowledge or granting consent, may lack full knowledge of criminal activity, or may bear only nominal or token blame for the illegal conduct serving as the foundation for the forfeiture.

### c. Summary

In conclusion, we hold that, for purposes of an Excessive Fines Clause challenge to a civil *in rem* forfeiture, a court must first assess whether the property sought to be forfeited is an instrumentality of the underlying offense. If the property is not found to be an instrumentality of the criminal conduct, the inquiry is dispositive and ends, and the forfeiture is unconstitutional. If the property is an instrumentality, the inquiry continues to the proportionality prong and an assessment of whether the value of the property sought to be forfeited is grossly disproportional to the gravity of the underlying offense. If it is grossly disproportional, the forfeiture is unconstitutional. As discussed in detail above, and summarized below, we find various factors to be relevant in resolving an excessive fines challenge to a civil in rem forfeiture. We caution, however that these factors are not meant to be exhaustive, and that additional factors, when relevant, may be considered by a court, depending upon the particular circumstances at issue.

In making the instrumentality determination, a court should consider, *inter alia*:

(1) whether the property was uniquely important to the success of the illegal activity;

(2) whether the use of the property was deliberate and planned or was merely incidental and fortuitous to the illegal enterprise;

(3) whether the illegal use of the property was an isolated event or repeated;

(4) whether the purpose of acquiring, maintaining or using the property was to carry out the offense;

(5) whether the illegal use of the property was extensive spatially and/or temporally; and

(6) whether the property is divisible with respect to the subject of forfeiture, allowing forfeiture of only that discrete property which has a significant relationship to the underlying offense.

The factors, among others, to be considered in assessing the value of the property are:

(1) the fair market value of the property;

(2) the subjective value of the property taking into account whether the property is a family residence or if the property is essential to the owner's livelihood;

(3) the harm forfeiture would bring to the owner or innocent third parties; and

(4) whether the forfeiture would deprive the property owner of his or her livelihood.

The factors to be considered in gauging the gravity of the offense include:

(1) the nature of the underlying offense;

(2) the relation of the violation of the offense to any other illegal activity and whether the offender fit into the class of persons for whom the offense was designed should be considered;

(3) the maximum authorized penalty as compared to the actual penalty imposed upon the criminal offender;

(4) the regularity of the criminal conduct — whether the illegal acts were isolated or frequent, constituting a pattern of misbehavior;

(5) the actual harm resulting from the crime charged, beyond a generalized harm to society; and

(6) the culpability of the property owner.

In this case, the trial court considered the three factors set forth in Bajakajian, as discussed above, but, in doing so, first compared the maximum penalty allowable for possession with intent to distribute, Graham's offense, as well as other maximum penalties for crimes which Graham could have been convicted, with the fair market value of the property. The court further opined that, for several years, Graham had sold drugs from the property and that his behavior put his neighbors, and police officers

investigating and serving search warrants, "in harm's way." Trial Court Opinion, 4/3/2013, at 14. Thus, the court concluded, based upon these considerations which we now find to be flawed, that the forfeited property was not grossly disproportionate to the gravity of the offense. As the trial court did not have the benefit of our explication of the proper proportionality assessment, we remand the matter to the Commonwealth Court, for remand to the trial court, for reconsideration of Appellee's Excessive Fines Clause challenge in light of our opinion.[31]

## B. Innocent Owner Defense

We also granted allocatur to consider the statutory question of whether the Commonwealth Court erroneously interpreted the innocent owner defense and improperly reweighed the evidence as found by the trial court. In assessing our standard of review over this question, we note that it concerns examination of the findings of fact made by the trial court to determine if they are supported by the substantial competent evidence, and whether the trial court abused its discretion or committed an error of law. *Commonwealth v. 605 University Drive*, 104 A.3d 411, 420 (Pa. 2014). This issue also involves, in part, a question of statutory construction, for which our standard of review is *de novo*, and our scope of review is plenary. *See 5444 Spruce Street*, 832 A.2d at 398. Finally, forfeiture statutes are subject to strict construction. *Commonwealth v. $6,425.00 Seized From Richard Esquilin*, 880 A.2d 523, 529 n.6 (Pa. 2005).

---

[31] Of course, if the court, however, first determines that Appellee met her burden of proving her "innocent owner defense," discussed below, then the court would have no reason to reach the merits of her constitutional challenge.

As noted above, the Forfeiture Act allows the Commonwealth to petition to seize an owner's property by meeting certain requirements. The Commonwealth has the initial burden of demonstrating that there is a "sufficient or substantial nexus between the property and the prohibited activity," and, thereafter, the burden shifts to the property owner to demonstrate that he or she did not know of the conduct giving rise to the forfeiture; or that the unlawful use or possession of the property was without his or her consent. *Commonwealth v. $2,523.48 U.S. Currency*, 649 A.2d 658, 659-60 (Pa. 1994); 42 Pa.C.S. § 6802(j).[32] This safeguard, known as the "innocent owner defense," serves as a "means of protecting a property owner from the harsh result of forfeiture because of illegal drug use to which the owner did not consent." 649 A.2d at 661.

With this enactment, modern forfeiture law departed from traditional forfeiture, as historically, "an owner's interest in property [could] be forfeited by reason of the use to which the property is put even though the owner did not know that it was to be put to

---

[32] 42 Pa.C.S. § 6802(j) provides:

> Owner's burden of proof.—At the time of the hearing, if the Commonwealth produces evidence that the property in question was unlawfully used, possessed or otherwise subject to forfeiture under section 6801(a) or 6801.1(a), the burden shall be upon the claimant to show:
>
> (1) That the claimant is the owner of the property or the holder of a chattel mortgage or contract of conditional sale thereon.
>
> (2) That the claimant lawfully acquired the property.
>
> (3) That it was not unlawfully used or possessed by him. In the event that it shall appear that the property was unlawfully used or possessed by a person other than the claimant, then the claimant shall show that the unlawful use or possession was without his knowledge or consent. Such absence of knowledge or consent must be reasonable under the circumstances presented.

such use." *Bennis v. Michigan*, 516 U.S. 442, 446 (1996).  The innocent owner defense reflects a balance between effective forfeiture laws and their laudable impact on illegal trade, and the protection of an innocent owner.  *$2,523.48 U.S. Currency*, 649 A.2d at 661.  Yet, because forfeiture proceedings are burdensome upon the property owner, many of whom are unrepresented by counsel, these statutes are to be strictly construed against forfeiture.  *Id.* at 630.

In addressing Appellee's claim that the trial court erred in rejecting her innocent owner defense, the Commonwealth Court found that the trial court erred in its analysis as it did not consider all the circumstances surrounding Appellee's actions.  *Id.* at 867-70.  Thus, the Commonwealth Court remanded the matter to the trial court for consideration of these circumstances.  In particular, the Commonwealth Court focused upon Appellee's contention that she did not have knowledge of or give her consent to the criminal activity which served as the basis for the government's forfeiture of her house and vehicle.  Specifically, the Commonwealth Court found that, because the police officers informed Appellee that her son was selling marijuana from her house and provided her with a search warrant, she acquired knowledge of the illegal activities.  However, the court first reasoned that Appellee was not required to believe the police allegations regarding her son when they executed their search warrant at Appellee's house, and that the trial court made no reference to specific allegations contained in the search warrant.  Ultimately, the Commonwealth Court concluded that the trial court failed to consider all of the circumstances surrounding Appellee's actions, or lack of action, in determining knowledge and consent to the underlying criminal activity, and whether Appellee's actions were reasonable.  Elaborating, the Commonwealth Court determined that it was not necessarily reasonable, as proffered by the Commonwealth, for a parent to evict a child, even an adult child, in order to show a lack of consent to the

child's illegal activities. Related thereto, the court rejected the Commonwealth's assertion that Appellee should have invited the police to her residence, as a property owner does not have to become a *de facto* police officer to establish a lack of consent. Thus, finding it not enough for a court to dismiss an innocent owner defense by simply disbelieving the property owner, the Commonwealth Court instructed the trial court, on remand, to identify the circumstances justifying a reasonable inference that the property owner had actual knowledge of and consented to the criminal activities underlying the forfeiture.

The Commonwealth contends that the Commonwealth Court rewrote the innocent owner defense by creating a *per se* rule that an owner-parent never has to evict an adult child, which the Commonwealth contends is contrary to the statute's case-by-case consideration of what is reasonable under the circumstances.[33] The Commonwealth offers that it has the initial burden of proving a nexus between the property and the illegal activity, and, here, Appellee's house and vehicle were used to facilitate the sale of illegal drugs, as marijuana was regularly sold from the house and the vehicle was used to store drugs. The burden of proof then shifted to Appellee to

---

[33] The Attorney General, as *amicus* in support of the Commonwealth, offers that the Commonwealth Court's decision will result in "the impairment of the Commonwealth's ability to prevail in any forfeiture matter where an innocent owner defense is pursued." Attorney General's Brief at 8-9. The Attorney General further contends that, although the burden is on the property owner to establish that he or she did not have knowledge or give consent to use the property in an illegal manner, the Commonwealth Court, required the trial court to identify circumstances that made it reasonable to infer that Appellee had actual knowledge and did not consent to the use of the property for illegal conduct. This, according to the Attorney General, impermissibly shifts the burden to the Commonwealth to demonstrate that the property owner had knowledge of illegal activity. Thus, the Attorney General avers that, contrary to legislative intent, under the Commonwealth Court's decision, the Commonwealth must now not only establish a nexus between the illegal activity and the property at issue, but also is required to essentially disprove an innocent owner defense.

prove an affirmative defense and to persuade the fact finder that she did not know about the illegal drug trade on her property or did not consent to it, and that her lack of knowledge or consent was reasonable under the circumstances. 42 Pa.C.S. § 6802(j). Here, the Commonwealth offers that Appellee claimed that she did not know about the sale of drugs, but the court disbelieved that assertion based upon the warnings offered by police. According to the Commonwealth, the Commonwealth Court, in rejecting the trial court's ability to simply find Appellee's testimony to be incredible as a basis to dismiss Appellee's innocent owner defense, improperly reversed the burden of proof by placing the burden on the Commonwealth to establish by affirmative evidence the lack of an innocent owner defense. Rather, the Commonwealth submits that the burden to establish an innocent owner defense is on the property owner, that incredible testimony does not establish an affirmative defense, and that the trial court was within its authority to make a negative credibility finding to reject that defense.

The Commonwealth maintains that Appellee's action was akin to claiming that the verdict was against the weight of the evidence, a conclusion that is only appropriate when the verdict is so contrary to the evidence as to shock one's sense of justice. As the trial court's ruling was consistent with the record evidence, and testimony was presented that police informed Appellee that her son was selling illegal drugs from the premises, the Commonwealth contends Appellee was required to establish that she expressed a lack of consent to selling the drugs, and that she failed to do so. Further, the Commonwealth accuses the lower court of creating a *per se* rule that a parent is never required to evict a drug dealing child, and submits that Appellee's innocent owner defense failed because she knew of the drug dealing and yet failed to take any action to stop it. While in some circumstances eviction could be an appropriate expectation, the Commonwealth offers that it was unreasonable for Appellee to do nothing, and the

Forfeiture Act requires a property owner who knows of drug dealing to do all he or she reasonably can under the circumstances. Ultimately, the Commonwealth maintains that, because it was Appellee's obligation to establish that her lack of knowledge or consent was reasonable under the circumstances, the trial court's rejection of Appellee's affirmative defense was proper.

Appellee counters that the trial court erred when it required her to establish both her lack of knowledge and lack of consent to the unlawful use of her property, as the Forfeiture Act requires that a property owner establish either a lack of knowledge *or* a lack of consent to the unlawful use of the property. 42 Pa.C.S. § 6802(j). Specifically, Appellee highlights what she considers to be an inadequate review of her innocent owner defense, as the trial court rejected it based on the Commonwealth's establishing that "Ms. Young either knew of or consented to her son's illegal activities on the subject properties." Trial Court Opinion, 4/3/2013, at 14. According to Appellee, this distorts the statutory requirements for the innocent owner defense, as it is unclear whether the trial court's resolution of that defense included whether she consented to her son using her property to sell drugs and her knowledge of the sale of drugs. Appellee proffers that evidence which establishes knowledge does not automatically establish consent, citing *$2,523.48 U.S. Currency*, 649 A.2d at 661.

Appellee maintains that, with respect to her knowledge of her son selling drugs from her property, and whether her actions were reasonable, the Commonwealth Court properly remanded with instructions that all of the circumstances be considered. She asserts that these circumstances include: Appellee's testimony that she was on bedrest during the relevant time period; that the police did not arrest Appellee's son Graham after their November search which could have impacted whether Appellee actually believed Graham was selling drugs; that the police did not show her evidence

implicating her son, despite promises to do so; the lack of drugs or drug paraphernalia in plain view in Appellee's home or vehicle; neighbor testimony that there was no indication of drug activity at her home; and Appellee's prior experience with her son. Appellee offers that, when multiple sources supported her testimony that she did not know her son was selling drugs from her home, the trial court erred by rejecting just one of those sources in reaching its conclusion that she did have such knowledge.

Finally, Appellee offers that she did not consent to her son selling drugs from her property.  Citing *$2,523.48 U.S. Currency*, Appellee contends that the innocent owner defense does not require that a property owner take any affirmative steps to stop the illegal use of the owner's property, id. at 660, and that our Court expressly rejected any suggestion that a property owner must do everything possible to prove a lack of consent; rather, the standard is one of reasonableness, and what is reasonable for one property owner may not be reasonable for another.  *Id.* at 558-59.  Appellee presses that the trial court rejected her innocent owner defense based on its finding that she did not either force her son to move out, or vacate the property herself.  Yet, according to Appellee, the trial court failed to consider whether either option was reasonable, ignored her testimony that she feared inviting the police back into her home after their November encounter, and did not address what steps she did take, including ejecting her son from her home when he was a teenager, asking the police for evidence of his drug dealings, and confronting him about the November investigation.  Thus, Appellee counters that, rather than the Commonwealth Court creating a *per se* rule that a parent is never required to evict an adult child from her home, as asserted by the Commonwealth, the Commonwealth Court here merely followed our Court's prior precedent that a trial court must consider all the circumstances in determining whether it

was reasonable for a parent to evict a child to demonstrate non-consent to the use of his or her property for the illegal sale of drugs.

In *$2,523.48 U.S. Currency*, we construed the innocent owner defense provision, indicating: "what is reasonable for one property owner may not be reasonable for another. All of the circumstances surrounding the property owner's actions, or lack of action, must be considered in determining if they were reasonable." Id. at 662. On review, we find that the trial court did not consider all of the relevant circumstances in this matter.

First, we reject the Commonwealth's assertion that the Commonwealth Court promulgated a *per se* rule that a property owner never is required to evict an adult child from his or her property; rather, we view its decision as requiring this possibility, along with all other circumstances, be considered in determining whether a property owner knows of, or consents to, the underlying illegal activities supporting the forfeiture. The Commonwealth Court did not foreclose the possibility that a property owner may be required to evict an adult child from a residence in order to satisfy the lack-of-consent aspect of the innocent owner defense.

Second, we find that, based upon the plain statutory language of the innocent owner defense, the Forfeiture Act requires that a property owner establish either a lack of knowledge *or* a lack of consent to the unlawful use of the property. 42 Pa.C.S. § 6802(j) ("In the event that it shall appear that the property was unlawfully used or possessed by a person other than the claimant, then the claimant shall show that the unlawful use or possession was without his knowledge or consent. Such absence of knowledge or consent must be reasonable under the circumstances."). Thus, in its analysis, a trial court must, as relevant, speak to both the knowledge of the property owner, and his or her consent (if placed at issue by the owner, and the court finds

knowledge). Knowledge does not establish consent. Here, we find that the trial court seemingly blurred the two independent considerations, and, on remand, should engage in an independent analysis of Appellee's knowledge and consent.

Related thereto, we conclude the Commonwealth Court did not err when it determined a trial court, when evaluating the sufficiency of the evidence to support an innocent owner defense, must consider all the evidence and "identify the circumstances that make it reasonable to infer that the property owner had actual knowledge and did consent to the violation of the Drug Act." *1997 Chevrolet*, 106 A.3d at 870. This assessment must recognize the difficult burden on a property owner to establish a negative — that he or she had no knowledge or gave no consent. Indeed, courts have generally recognized the inherent difficulties in meeting this burden. *See Commonwealth v. DeHart*, 516 A.2d 656, 668 (Pa. 1986) (noting the virtually impossible burden of establishing a negative); *United States v. Wilgus*, 638 F.3d 1274, 1288-89 (10th Cir. 2011) (recognizing "inherently difficult" task of proving a negative); *United States v. Ollie*, 442 F.3d 1135, 1143 (8th Cir. 2006) (offering that the "law generally frowns on requiring a party to prove a negative"). Compounding this difficulty is that property owners may face forfeiture proceedings without the assistance of counsel, inasmuch, as noted above, there is no constitutional right to counsel in such proceedings.

Finally, we mandate this rigorous consideration of all the circumstances because, as in this case, a property owner's *residence* may be the subject of the civil forfeiture. In Pennsylvania, as elsewhere, the home is an especially significant type of property. The loss of one's home, regardless of its monetary value, not only impacts the owner, but may impact other family members, and one's livelihood. Indeed, the home is where one expects the greatest freedom from governmental intrusion; it not only occupies a

special place in our law, but the most exacting process is demanded before the government may seize it.

Turning to the matter before us, while the trial court generally offered that "the record in no way supports [the] contention" that Appellee lacked knowledge of the illegal activities in her home, and noted that the search warrant offered to Appellee informed her of her son's illegal activities, we find that the court did not engage in the probing inquiry necessary before coming to a full and reasoned conclusion. Trial Court Opinion, 4/3/2013, at 11. As noted by the Commonwealth, various parts of the record were not considered, or at least addressed, by the trial court. Specifically, the court did not address Appellee's past dealings with her son when she discovered drug usage; her contention that she did not see any drugs in her home or van; her explanation that she only allowed her son to return home due to her belief that he had stopped using illegal drugs; her assertions that, if she had found drugs in her home, she would have evicted her son; that no neighbors or the block captain reported knowledge of drug dealing from the home or problems with Appellee's son; that she requested from police some proof that her son was selling drugs, but that no proof was ever proffered; and the failure of the police to arrest her son after executing a search warrant on the home in November 2009. All of these circumstances should have been accounted for and considered by the trial court in rendering its decision. Furthermore, the prospect of evicting Appellee's son needed to be contemplated in the context of an elderly widow with serious health challenges who relied upon her son for living assistance. The trial court should have considered what was reasonable under these circumstances. *See United States v. 6625 Zumirez Drive, Malibu, California*, 845 F.Supp. 725, 736 (C.D. Cal. 1994) ("Parents should [not] be shielded from the forfeiture laws; rather, it means that the

Court considers the relationship between the parties in evaluating the gravity of the landowner's conduct.").

Ultimately, we agree with the Commonwealth Court that it is not enough to simply reject the testimony of the property owner if there is other evidence of record as well. Instead, especially in this area of the law, we hold that the trial court must faithfully identify the circumstances that make it reasonable to infer that the property owner had actual knowledge of the illegal use of the property or consented to the underlying criminal activity. *1997 Chevrolet*, 106 A.3d at 870. We have indicated that, in this area, exacting review is required. *See $6,425.00 Seized From Richard Esquilin*, 880 A.2d at 535 ("The trial court found appellee's evidence unpersuasive, *carefully explaining its reasons for discounting the varied claims.*" (emphasis added)). In sum, the trial court must consider all of the circumstances before rejecting an innocent owner defense.[34] Therefore, we affirm the Commonwealth Court's order, remanding the matter to the trial court, for consideration of all of the relevant circumstances in evaluating Appellee's evidence proffered in support of her innocent owner defense.

### III. Conclusion

Thus, for all of the above reasons, we affirm the order of the Commonwealth Court, which remanded the matter to the trial court, for further proceedings, but consistent with our decision.

Jurisdiction relinquished.

---

[34] In requiring such review, we are not upsetting the statutory burdens of proof found in the Forfeiture Act as asserted by the Commonwealth. Rather, we are mandating compliance with that statute and our case law, and ensuring that innocent property owners are not dispossessed of what may be essential possessions — even though not convicted of or even charged with a crime — without rigorous scrutiny by the courts.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty and Wecht join the opinion.